[No. E041513. Fourth Dist., Div. Two. May 22, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFREY FARRAR DEAN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.C. and D.

COUNSEL

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KING, J.—

## I. INTRODUCTION

Defendant Jeffrey Farrar Dean appeals from a judgment and order committing him to the State Department of Mental Health as a sexually violent predator (SVP).[1]

Defendant contends: (1) the trial court erroneously permitted plaintiff's experts to testify to inadmissible hearsay; (2) as implemented in Riverside

---

[1] We are mindful that SVP petitions are civil, not criminal matters. In the underlying action, the State of California was the petitioner, and Jeffrey Dean, the respondent. On appeal,

County, the appointment of only one expert for defendant violated his due process rights; and (3) his recommitment is illegal in that the protocols relied upon by plaintiff's experts had not been adopted as administrative regulations. We affirm the judgment and order of recommitment.

## II. SUMMARY OF FACTS

The present recommitment petition was filed on December 13, 2005.[2] Attached to the petition were the reports of Drs. Harry Goldberg and Dawn Starr, both Department of Mental Health evaluators. For purposes of the recommitment petition, the qualifying offenses were a 1982 forcible rape conviction and a 1983 sodomy conviction. Following a probable cause hearing, a jury trial commenced in August 2006. In support of the petition, the prosecutor called Drs. Goldberg and Starr. In addition, plaintiff called defendant and submitted into evidence redacted versions of his Penal Code section 969b packet and portions of the probation reports dealing with both qualifying offenses. Testifying for defendant were John Peterson, a psychiatric technician at Atascadero State Hospital (ASH), and Dr. Theodore Donaldson.

The jury returned a "true" finding on the recommitment petition. To the extent relevant, the evidence and facts will be discussed *post*.

## III. ANALYSIS

■ The purpose of the Sexually Violent Predator Act (SVPA) " 'is to identify persons who have certain diagnosed mental disorders that make them likely to engage in acts of sexual violence and to confine [them] for treatment of "their disorders only as long as the disorders persist and not for any punitive purposes." [Citation.]' [Citation.]" (*Murillo v. Superior Court* (2006) 143 Cal.App.4th 730, 735 [49 Cal.Rptr.3d 511].)

■ At trial, the plaintiff bears the burden of proving beyond a reasonable doubt that the defendant is an SVP. (Welf. & Inst. Code, § 6604;[3] *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1147 [81 Cal.Rptr.2d 492, 969 P.2d 584].) ■ At the time relevant here, the SVPA defined an SVP as "a

however, the State of California is the respondent. For the purpose of clearly identifying the parties, Jeffrey Dean will be referred to as defendant and the People will be referred to as plaintiff.

[2] The initial petition for commitment was filed in December 2001. On November 14, 2003, a subsequent petition was filed. On February 2, 2004, defendant waived trial on both petitions and agreed to "voluntary recommitment" through January 29, 2006.

[3] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

person who has been convicted of a *sexually violent offense* against two or more victims and who has a *diagnosed mental disorder* that makes the person a danger to the health and safety of others in that it is *likely* that he or she will engage in sexually violent criminal behavior." (Former § 6600, subd. (a), italics added; see *People v. Vasquez* (2001) 25 Cal.4th 1225, 1231 [108 Cal.Rptr.2d 610, 25 P.3d 1090].)

■ The SVPA requires a determination that the defendant is likely to engage in " 'sexually violent *predatory* criminal behavior.' " (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1186–1187 [124 Cal.Rptr.2d 186, 52 P.3d 116], italics added.) A defendant is " '*likely* [to] engage in sexually violent [predatory] criminal behavior' " if he or she "is found to present a *substantial danger*, that is, a *serious and well-founded risk*, of committing such crimes if released from custody." (*People v. Roberge* (2003) 29 Cal.4th 979, 982, 988 [129 Cal.Rptr.2d 861, 62 P.3d 97], fn. omitted.)

■ Under the SVPA as of the time relevant here, "where the requisite SVP findings are made, 'the person shall be committed for two years to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility designated by the Director of Mental Health . . . .' " (*Hubbart v. Superior Court, supra*, 19 Cal.4th at p. 1147, quoting former § 6604.) "Confinement generally cannot exceed two years unless a new petition is filed and an extended commitment is obtained from the court." (*Hubbart v. Superior Court, supra*, at p. 1147.)[4]

A. *There Was No Reversible Error in Allowing Plaintiff's Experts to Testify to Inadmissible Hearsay*

Defendant contends that, "[d]uring the course of the prosecution's experts' testimony, [defendant's] trial counsel objected to the inadmissible hearsay on a number of occasions. On each occasion, the trial court overruled this objection. . . . These evidentiary rulings were error. The trial court should have excluded some or all of the hearsay testimony presented by the prosecution's experts. By failing to do so, the trial court abused its discretion and deprived [defendant] of a fair trial."

Defendant argues that plaintiff's experts were allowed to testify to inadmissible hearsay in three specific areas: (a) facts of the qualifying offenses, (b) the fact that defendant was convicted of and/or pled guilty to the qualifying offenses, and (c) information gleaned from the records of ASH and other institutions.

---

[4] In 2006, section 6604 was amended to provide: "If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an *indeterminate term* . . . ." (Italics added.)

"As a general matter, a trial court is vested with broad discretion in ruling on the admissibility of evidence. The court's ruling will be upset only if there is a clear showing of an abuse of discretion, i.e., that the court exceeded the bounds of reason." (*In re Marriage of Slayton & Biggums-Slayton* (2001) 86 Cal.App.4th 653, 661 [103 Cal.Rptr.2d 545].) "A trial court enjoys broad discretion in ruling on foundational matters on which expert testimony is to be based. [Citations.] However, the discretion to admit or exclude evidence is not unlimited. 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. [Citation.]' [Citations.]" (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523 [3 Cal.Rptr.2d 833], fn. omitted.) The vast majority of the hearsay testified to by plaintiff's experts on direct was properly admitted from other sources. To the extent plaintiff's experts testified to inadmissible hearsay, defendant has failed to demonstrate a prejudicial abuse of discretion.

■ As a general rule, out-of-court statements offered to support an expert's opinion are not hearsay because they are not offered for the truth of the matter asserted. Instead, they are offered for the purpose of assessing the value of the expert's opinion. (*People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209–1210 [30 Cal.Rptr.3d 582].)

■ " '[A]n expert may generally base his opinion on any "matter" known to him, including hearsay not otherwise admissible, which may "reasonably . . . be relied upon" for that purpose. [Citations.] On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them. However, prejudice may arise if, " 'under the guise of reasons,' " the expert's detailed explanation " '[brings] before the jury *incompetent hearsay evidence.*' " ' " (*People v. Catlin* (2001) 26 Cal.4th 81, 137 [109 Cal.Rptr.2d 31, 26 P.3d 357], italics added.) ■ Here, other than some testimony as to the ASH and other institutional records, the facts testified to by the experts did not bring before the jury incompetent hearsay evidence. The facts testified to were admitted into evidence from other sources. Because of this, plaintiff's experts were not precluded from reiterating the same facts during their direct examination.

### 1. *Expert Testimony As to the Facts of the Qualifying Offenses*

■ Under section 6600, subdivision (a)(3), *"The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence,* including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of

Mental Health." (Italics added.) As interpreted by *People v. Otto* (2001) 26 Cal.4th 200 [109 Cal.Rptr.2d 327, 26 P.3d 1061] (*Otto*), section 6600, subdivision (a)(3) is a hearsay exception for victim hearsay statements, including multiple-level victim hearsay statements, when offered to prove a qualifying prior conviction. (*Otto, supra,* at pp. 206–209.) Here, plaintiff, by way of exhibits 2A and 3A and pursuant to the hearsay exception established by *Otto,* submitted into evidence redacted portions of two probation reports which contained the multiple-level hearsay statements of the respective victims. Details of each of the offenses were therefore the proper subject matter of both experts' testimony.

Relative to the first qualifying offense, the 1982 forcible rape, the probation report contained the following statement given by the victim to the investigating officer: "[T]hat at approximately 9:30 P.M. the previous evening, while dressed in her pajamas and robe, [victim] heard something at the window of her bedroom. [Victim] investigated further and observed a male subject pointing a gun at her. At this time, the suspect instructed [victim] to open the door which led from the bedroom to the outside. The victim was afraid the suspect would shoot her, so she complied. Once inside, the suspect demanded [victim] tell him where her money and valuable jewelry were hidden. When [victim] explained that she was poor and did not have any, the suspect became angry and hit her on the back of the head with his sawed-off rifle, knocking her to the floor. He stated that all old people have hidden money and jewelry. All during this time, the suspect made [victim] stand with her back to him so she could not see him. After being knocked to the floor, [victim] remained there on orders from the suspect as he started ransacking her purse and the drawers in her residence. After the suspect removed $22.00 from her purse [victim] told him that there was some money in the freezer in a bandaid box . . . . [¶] The suspect proceeded to the refrigerator, removed a root beer, poured some in a plastic glass for [victim]. [Victim] stated that he put something in the cup but she does not know what it was. [Victim] spilled the drink on the ground for fear that it might be poison. The suspect drank the contents from the can. The suspect then led [victim] to the bathroom where he ordered her to strip off her clothing. The suspect told her that he did this so he could get away without her following him. [Victim] complied, then the suspect started filling the bathtub and forced her to get into the tub. After several minutes, he instructed [victim] to get out of the tub and led her into the bedroom. At this point, [victim] was forced to lay down on the bed. The suspect turned off the lights, then rolled [victim] on her back and attempted to rape her. [Victim] stated that the suspect tried to insert his penis into her vagina several times, however, it was very painful to her and she started screaming. The suspect then stopped and got a bottle of lotion and spread it on [victim's] vagina. Then, he attempted to insert his penis, still it was painful and the suspect could not penetrate. The suspect

then told [victim] to masturbate him which she complied because she was afraid of being hurt. After several minutes, he instructed [victim] to lay face down on the bed and not to move. The suspect then went into the kitchen and got a paper bag and began filling it with can[ned] goods. As the suspect was leaving, he took [victim's] rape whistle so she could not call for help and pulled the phone wire off of the wall. Then, he took the lotion and threw it out the door and onto the lawn. The suspect told [victim] that if she called the police he would be back to get her. The suspect then left the residence without further incident and because [victim] was afraid that the suspect would return, she did not call the police. However, she did contact her neighbor who in turn called the police."

As to the second qualifying offense of sodomy, the probation report contained the following statement given by the victim to an investigating officer: The victim indicated "approximately two or three weeks ago, . . . [defendant] had sodomized [victim] while they were in the 'day room.' Although there were approximately 30 other inmates in the same 'day room,' [victim] stated that everyone else was asleep. [¶] [Victim] related that he was sitting on the floor next to [defendant] and at first [defendant] tried to persuade [victim] to orally copulate [defendant]. [Victim], who is smaller than [defendant], said that he was afraid of him. [Victim] related that [defendant] grabbed his head with one hand and forced it down to [defendant's] penis. [Victim] said that he refused to open his mouth. After unsuccessfully attempting to get [victim] to orally copulate [defendant], [defendant], who was wearing only boxer shorts, unsnapped [victim's] jumpsuit and pulled it down below his buttocks. [Defendant] then forced [victim] to lay beside him. Then, [defendant] forced his penis into [victim's] anus. [Victim] said that he tried to resist by tightening his anus, however, [defendant] told him to relax or he would let a guy in the day room beat him up. [¶] [Victim] related that he does not know how long [defendant] was behind him pushing his penis on his anus. All [victim] could say is that [defendant] was hurting him and he does not know if [defendant] ejaculated inside him. . . ."

Under *Otto,* plaintiff's experts could properly testify on direct to all of the above referenced facts as being a basis for their respective opinions. All of the facts were provided by the victims of the qualifying offenses and were therefore admissible into evidence under section 6600, subdivision (a)(3).

### 2. *Expert Testimony As to the Fact That Defendant Was Convicted of and/or Pled Guilty to the Qualifying Offenses*

Under section 6600, subdivision (a)(3), " '[t]he existence of any prior convictions may be shown with documentary evidence.' " (*Otto, supra,* 26 Cal.4th at p. 206.) Here, plaintiff properly established by documentary

evidence and otherwise that defendant had sustained two qualifying convictions. Thus, there was no error in allowing plaintiff's experts to testify on direct to the fact of said prior convictions. The Penal Code section 969b package, which was properly admitted into evidence, showed that defendant suffered both of the relevant convictions.

Furthermore, defendant testified that a jury found him guilty in the matter involving the forcible rape. He further testified that he: pled guilty to a violation of Penal Code section 286, subdivision (e) dealing with sodomy in the case involving a fellow inmate; at a 2004 hearing, he admitted that he had committed the above two crimes qualifying him as an SVP; he made the same admission in 2000; and, on January 29, 1998, he was asked by a judge if he wished to admit that he had been convicted of sexually violent predatory offenses against two or more victims, and he responded, "yes."

To the extent the experts testified on direct to the fact of the qualifying convictions, there was no error. The evidence of said convictions was admitted into evidence by way of other sources.

### 3. *The Experts' Testimony As to Information in the ASH and Other Institutional Records*

Allowing plaintiff's experts to testify extensively on direct examination to the details of the ASH and other institutional records is more problematic.

As earlier indicated, "An expert may generally base his opinion on any 'matter' known to him, including hearsay not otherwise admissible, which may 'reasonably . . . be relied upon' for that purpose." (*People v. Montiel* (1993) 5 Cal.4th 877, 918 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) Here, Drs. Goldberg and Starr could reasonably rely on and base their opinions on the ASH and other institutional records in forming their opinions. (See *Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, 743 [74 Cal.Rptr.3d 715] [hospital records can be used as a basis for expert opinion].)

A problem arises, however, when, on direct examination, an expert brings before the jury inadmissible hearsay. As stated in *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388 [264 Cal.Rptr. 779], "while an expert may rely on inadmissible hearsay in forming his or her opinion [citation], and may state on direct examination the matters on which he or she relied, the expert may not testify as to the details of those matters if they are otherwise inadmissible." (*Id.* at p. 415.) This rule is based in part upon the rationale that by allowing an expert to testify as to the details of inadmissible hearsay reports, the jury might improperly consider such testimony as independent proof of the facts described in the reports and the

adverse party is denied the opportunity to cross-examine the person who made the statements. (See *Frampton v. Hartzell* (1960) 179 Cal.App.2d 771, 773 [4 Cal.Rptr. 427]; *People v. Campos* (1995) 32 Cal.App.4th 304, 308 [38 Cal.Rptr.2d 113].)

We are mindful that, as a general rule, out-of-court statements offered to support an expert's opinion are not hearsay because they are not offered for the truth of the matter asserted, but rather for the purpose of assessing the value of the expert's opinion. (*People v. Thomas, supra,* 130 Cal.App.4th at pp. 1209–1210.) However, " 'prejudice may arise if, " 'under the guise of reasons,' " the expert's detailed explanation " '[brings] before the jury incompetent hearsay evidence.' " ' [Citations.] In this context, the court may ' "exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value." ' [Citation.]" (*People v. Catlin, supra,* 26 Cal.4th at p. 137.)

Here, plaintiff's experts testified on direct to the details of the ASH and other institutional records. On our record, all of this was inadmissible hearsay.[5] Dr. Goldberg testified on direct as follows. He reviewed the ASH records generated between August 2003 and August 2005. Defendant was first admitted to ASH in 1998. While in ASH, defendant did not participate in treatment. ASH has a five-phase treatment program. Defendant started attending phase 1, but dropped out. He did not complete phase 1 and there was no indication that defendant returned to treatment. There was also treatment available at ASH for substance abuse, but defendant did not participate. Defendant did not follow his diabetic regimen at ASH, which caused severe medical problems. At ASH, defendant had problems verbally mouthing off to staff. He was aggressive and verbally hostile to people at ASH. He called a female staff member at ASH a dog who pees all over the place. He has a hostile relationship towards women and he has a poor employment record. There have also been a number of incidents, such as attempting to buy pain

---

[5] The respective records were not marked as exhibits. None of the arguably admissible portions of the records were admitted into evidence pursuant to Evidence Code sections 1271 or 1272. Hospital and prison records, if properly authenticated, fall within the umbrella of the business record exception. (*People v. Moore* (1970) 5 Cal.App.3d 486, 492–493 [85 Cal.Rptr. 194]; *People v. Lopez* (1963) 60 Cal.2d 223, 253–254 [32 Cal.Rptr. 424, 384 P.2d 16].) A proper foundation for the records includes evidence that the writing was made in the regular course of the business. It must also appear that the writing was made at or near the time of the act, condition, or event and that the method and time of preparation were such as to indicate its trustworthiness. A foundation of this nature ensures that the entries are made by personal knowledge, not on secondhand information days following the act, condition or event. (*Garibay v. Hemmat, supra,* 161 Cal.App.4th at p. 742; see *People v. Reyes* (1974) 12 Cal.3d 486, 503 [116 Cal.Rptr. 217, 526 P.2d 225]; *People v. Campos, supra,* 32 Cal.App.4th at pp. 308–309 [where substantial portions of psychiatric records and reports were not admissible under the business record exception in that they did not record an act, condition or event within the meaning of Evid. Code, § 1271].)

pills and associating with a staff member who had some questionable relationships and was under suspicion for bringing drugs into the institution. Presently, defendant is noncompliant with the program in terms of treatment.

Dr. Goldberg also viewed other documents in which there were allegations of a rape in 1978 when defendant was 17. He further testified that defendant began committing crimes at a young age (around 12 or 13), which resulted in placement in juvenile camps and eventually the California Youth Authority (CYA); defendant continued to engage in illegal activity during his adult years. Additionally, the victim of the 1983 sodomy accused defendant of having raped other males in the jail setting.

Dr. Starr testified as follows. She reviewed the records generated by the state hospital facilities. Defendant was sent to ASH in 1998. When he first arrived, he told the evaluating psychiatrist that he received sexual gratification from the robbery. He also spoke of using marijuana, PCP, and crank. He was put on an individualized treatment plan, which not many patients receive. He did not participate in treatment at ASH. He violated various boundary rules with female staff. On one occasion, a female staff person who was suspected of being involved in illegal drugs was observed coming from his room; a drug dog was brought in, which immediately hit on defendant. Defendant then went to the library without permission. They did not find any drugs in the room. On another occasion, he wrote "cunt" in large capital letters on a dry erase board in the hospital. She noted the score given by another doctor on the PCL-R (Hare Psychopathy Checklist–Revised) test was 34.

Dr. Starr also looked at documents from the Department of Corrections and Rehabilitation. As it relates to defendant, she looked at the correctional file, disciplinary writeups, and rap sheet. Based on these documents, she testified that defendant has been in prison since 1983. He spent time at juvenile facilities, CYA, and mental hospitals. His juvenile offenses include arson by setting a school on fire, assault with a BB gun on a neighbor, and throwing rocks at vehicles. In 1976, he was charged with burglary, brandishing a firearm, and trespassing. He also escaped from a psychiatric hospital as well as from juvenile hall. In 1978, while at CYA, it was alleged that he committed a forcible rape, sodomy, and oral copulation. While in prison in 1983, he spoke of plans to kill six people. He had serious disciplinary writeups, including possession of sedatives, stimulants, and marijuana. He was convicted of two counts of burglary in Alabama. There are reports of defendant engaging in nonconsensual sex with at least three other male victims in 1983 while he was in custody.

It is clear that both doctors testified in great detail as to the ASH and other institutional records. Many of the entries testified to were highly prejudicial

in that they dealt with other acts of misconduct, of which there was no competent evidence. We acknowledge the trial court has wide latitude in ruling upon the admissibility of evidence and those rulings will not be upset unless there is a clear showing of abuse of discretion. Nonetheless, the trial court is the gatekeeper of the evidence to which the jury is exposed. "A trial court . . . 'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay.' [Citation.] A trial court also has discretion 'to weigh the probative value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein.' [Citation.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 619 [59 Cal.Rptr.2d 356, 927 P.2d 713].)[6]

██ Within this context, "probative value" refers to the relative reliability of the inadmissible evidence and its necessity to the jury's understanding of the credibility and bases for the expert opinion. This must be weighed against the risk that the jury will view and use this inadmissible evidence for an improper purpose, i.e., as substantive evidence against the defendant. This risk is increased when the reports are particularly inflammatory or describe prior misconduct. (Cf. *People v. Ewoldt* (1994) 7 Cal.4th 380, 404 [27 Cal.Rptr.2d 646, 867 P.2d 757] [analyzing prejudicial effect of evidence of uncharged misconduct for purposes of Evid. Code, § 1101, subd. (b)]; *People v. Albarran* (2007) 149 Cal.App.4th 214, 230–231 [57 Cal.Rptr.3d 92] [expert gang evidence that was extremely inflammatory prevented a fair trial].)

In weighing the probative value of the inadmissible hearsay against the risk that a jury will use the evidence for an impermissible purpose, a comparison of Dr. Goldberg's testimony to that of Dr. Starr's is instructive. While we believe both experts should have been precluded from testifying in such detail, the testimony of Dr. Goldberg was far more benign. Dr. Goldberg testified that he reviewed the ASH records generated between August 2003 and August 2005. Defendant was first admitted to ASH in 1998. While in ASH, defendant did not participate in treatment. ASH has a five-phase treatment program. Defendant started attending phase 1, but dropped out. He did not complete phase 1 and there was no indication that defendant returned to treatment. There was also treatment available at ASH for substance abuse, but defendant did not participate. Defendant did not follow his diabetic regimen at ASH, which caused severe medical problems. At ASH, defendant had problems verbally mouthing off to staff. He was aggressive and verbally hostile to people at ASH. He has a hostile relationship towards women and he has a poor employment record. Dr. Goldberg further testified that defendant

---

[6] This is so even though a limiting instruction is given at the time the testimony is received. (See *People v. Coleman* (1985) 38 Cal.3d 69, 92 [211 Cal.Rptr. 102, 695 P.2d 189] ["where hearsay evidence is recited in detail, a limiting instruction may not remedy the problem."].)

began committing crimes at a young age and continued to engage in illegal activity during his adult years. We believe Dr. Goldberg's testimony should have been limited. In bringing before the jury the *matters relied upon* to form his opinion, his testimony should have been circumscribed to more general testimony. He could have permissibly testified that the records demonstrated the extent to which defendant participated in treatment while at ASH, the degree to which defendant followed his diabetic regimen, and how he interacted with women staff members and other individuals at ASH. Additionally, he could have properly testified that the records reflected defendant's interaction with the criminal justice system. Limiting Dr. Goldberg's testimony in such a way still affords him the ability to communicate to the jury the matters relied upon in forming his opinion without bringing before it inadmissible hearsay.

With this said, we nonetheless cannot find that the trial court abused its discretion in allowing Dr. Goldberg to testify as he did. While all of his testimony relayed inadmissible hearsay information, it was still of such a general nature that, in conjunction with a limiting instruction, the risk of it being improperly used by the jury was minimal.[7]

On the other hand, Dr. Starr was allowed to improperly testify to the specifics of the entries. She testified that on one occasion, a female staff person who was suspected of being involved in illegal drugs was observed coming from defendant's room; a drug dog was brought in, which immediately hit on defendant. Defendant then went to the library without permission; on another occasion, he wrote "cunt" in large capital letters on a dry erase board in the hospital; his juvenile offenses include arson by setting a school on fire, assault with a BB gun on a neighbor, and throwing rocks at vehicles. In 1976, he was charged with burglary, brandishing a firearm, and trespassing. He also escaped from a psychiatric hospital as well as from juvenile hall. In 1978, while at CYA, it was alleged that he committed a forcible rape, sodomy, and oral copulation. While in prison in 1983, he spoke of plans to kill six people. He was convicted of two counts of burglary in Alabama. There are reports of defendant engaging in nonconsensual sex with at least three other male victims in 1983 while he was in custody. This testimony is highly inflammatory and, without foundational testimony concerning the records, is of questionable reliability.[8] The value of this testimony to support the bases of Dr. Starr's opinions is simply outweighed by the risk that the

---

[7] "Assuming that inadmissible hearsay utilized by an expert to form an opinion does make its way to the jury's attention . . . a limiting instruction under [Evid. Code] section 355 may be requested to control the jury's use of the information." (*Korsak v. Atlas Hotels, Inc., supra,* 2 Cal.App.4th at p. 1525.)

[8] Here, there was no evidence concerning the reliability of the reports of specific incidents described in the ASH records. Although the records, when used as the basis for the experts' opinions, need not necessarily be admissible or meet the requirements for the business record

jury will impermissibly use the information. In short, under the guise of supporting her opinion, such testimony improperly brought before the jury incompetent hearsay evidence. The trial court abused its discretion in allowing such detailed testimony from documents not otherwise admissible into evidence.

■ We reiterate, "The rule which allows an expert to state the reasons upon which his opinion is based may not be used as a vehicle to bring before the jury incompetent evidence. [Citation.] . . . [I]t [is] proper to prohibit doctors . . . from detailing the contents of reports they . . . relied upon. [Citation.] As in [*People v.*] *Odom* [(1980) 108 Cal.App.3d 100 [166 Cal.Rptr. 283]], the psychiatric records relied upon by [appellant's experts] were inadmissible except to explain that they relied on the reports in reaching their conclusions." (*People v. Young* (1987) 189 Cal.App.3d 891, 913 [234 Cal.Rptr. 819].) ■ Experts can properly and credibly place before the jury the matters they relied upon and the nature of those matters without testifying to the specific details of the documentary entries not otherwise admitted into evidence.[9]

Nonetheless, we believe the experts' (primarily Dr. Starr's) reiteration on direct of these matters was harmless. Here, the trial court more than once gave limiting instructions to the jury. Near the beginning of Dr. Goldberg's testimony, the court instructed the jury as follows: "[T]his might be an appropriate time for me to give you an instruction dealing with the consideration of expert testimony. I'll give you more instructions on this later on, but I want you to understand at this time that witnesses will be allowed to testify as experts and to give an opinion. . . . [¶] . . . [¶] Now, when the witness refers to information that he's received from other sources, that's not being received for the truth of the matter stated from those sources, but it's being received for the purpose of explaining the reasons for the expert's opinion." At the beginning of Dr. Starr's testimony, the court instructed the jury, "And that's this, that an expert witness may testify that in reaching their conclusions as expert witnesses they considered statements made by other persons and sources. Now you may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true or false." And later, "Let me educate

---

exception to the hearsay rule, the reliability of the report is a relevant consideration in evaluating whether to permit the experts to testify about particular incidents. (*People v. Catlin, supra*, 26 Cal.4th at p. 137.) Here, other than the averrment that the matters testified to were contained within the ASH and other institutional records, there was nothing to support the reliability of reports of particular events.

[9] On cross-examination, greater latitude should be afforded the experts and counsel to bring before the jury inadmissible hearsay to either support or attack the underlying opinions expressed on direct. (*People v. Coleman, supra*, 38 Cal.3d at p. 92; *People v. Campos, supra*, 32 Cal.App.4th at p. 308.)

you a little bit on hearsay. Hearsay statements are made by witnesses outside the court—outside of these proceedings, and those people are not here to see and hear and question. And so their declarations are hearsay. But they can be admitted for the reasons given by the expert for their opinions. And it's up to you to evaluate the reliability of those sources." As a whole, the jury was properly admonished. And, at the conclusion of the trial, the jury was further instructed with Judicial Council of California Criminal Jury Instructions (2006) CALCRIM Nos. 303 and 360, which directed the jurors to consider evidence only for the purpose for which it was admitted and to not consider expert testimony as proof of the truth of statements relied upon by the expert.[10]

Additionally, when looking at the general areas in which Drs. Goldberg and Starr testified on direct as to entries in the institutional records, the majority of the information was testified to by defendant either during his direct or redirect examination. Defendant testified that he did not participate in treatment while at ASH. He acknowledged that he was verbally aggressive toward female staff, and that he possessed drugs during confinement. Based on the entire record, including the court's limiting instructions and the ultimate opinions rendered by Drs. Goldberg and Starr (which are discussed, *post*), it is not reasonably probable that a result more favorable to defendant would have been achieved in the absence of the jury hearing about these matters on the direct examination of the prosecution's experts. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

B. *As Implemented in Riverside County, the Appointment of Only One Expert for Defendant Did Not Violate His Due Process Rights*

Defendant contends that the SVP process is unconstitutional under the due process clause. He argues that in Riverside County the plaintiff is able to present two expert witnesses paid for by the Department of Mental Health, whereas the defendant is only able to call one court-appointed expert. As part of this argument, he asserts that his expert should be compensated at a rate commensurate with that paid to the Department of Mental Health experts. We disagree with defendant.

▮ Defendant submits, as he did at trial, that " 'the SVP Law stacks the deck against the indigent respondent by providing the district attorney with a

---

[10] CALCRIM No. 303 reads: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

CALCRIM No. 360 reads: "Expert witnesses testified that in reaching their conclusions as an expert witness, they considered . . . statements made by other persons and sources. You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true."

minimum of two expert witnesses and only providing the indigent respondent with one.' " Initially, we believe that defendant's underlying premise is faulty. There is nothing in the SVP law that mandates that the plaintiff be allowed to call two or more experts to testify. Section 6601 deals with prerelease evaluations by the Department of Mental Health, requests by the Department of Mental Health to file petitions for commitment, and the filing of petitions by the district attorney or county counsel. Section 6601, subdivision (d) mandates that before the Department of Mental Health may request the filing of a petition, two evaluators must concur that the defendant meets the criteria of an SVP. The law does not require the prosecutor to plead or prove to a trier of fact that two evaluators agree.

In *People v. Scott* (2002) 100 Cal.App.4th 1060 [123 Cal.Rptr.2d 253], the defendant argued on appeal that the People's evidence was insufficient as a matter of law because only one expert testified that defendant was an SVP. The Court of Appeal disagreed: "Scott's reasoning is flawed. The Legislature has imposed procedural safeguards to prevent meritless petitions from reaching trial. '[T]he requirement for evaluations is not one affecting disposition of the merits; rather, it is a collateral procedural condition plainly designed to ensure that SVP proceedings are initiated only when there is a substantial factual basis for doing so.' [Citation.] . . . [¶] . . . [¶] [A]lthough there must be two concurring experts as a procedural prerequisite to commencement of the petition process (§ 6601, subds. (c), (d)), the [SVPA] does not expressly require two experts to testify at trial on behalf of the People." (*Id.* at pp. 1063–1064.)

Here, plaintiff called two experts. From the record, the testimony of Drs. Goldberg and Starr appears to have been cumulative. At trial, defendant filed a nine-page points and authorities titled "Motion to Dismiss," dealing with a number of alleged constitutional infirmities of the SVPA. At no time did defendant raise the evidentiary objection that plaintiff should be limited to one expert based on the cumulative nature of the experts' testimony. As provided in Evidence Code section 723, "[t]he court may, at any time before or during the trial of an action, limit the number of expert witnesses to be called by any party." This rule was discussed in *South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861 [85 Cal.Rptr.2d 301]. "On this record, the trial court acted within its discretion in excluding [the second expert witness's] testimony as cumulative. As the court properly observed, South Bay's designation of expert witnesses indicated the scope of [the second expert witness's] anticipated testimony was a 'duplicate' of the subject matter covered by [the first expert witness]. Further, South Bay's counsel acknowledged that 'there's a substantial overlap' in the two experts' testimony and that [the second expert's] testimony would be covering ground already covered by [the first expert witness]." (*Id.* at p. 906; see also *Redondo Beach School Dist. v. Flodine* (1957) 153 Cal.App.2d 437, 449 [314 P.2d 581]

["The court in its discretion may limit the number of witnesses who may be called upon to testify with reference to a single question, as here, and the court can refuse to receive evidence which is purely cumulative."].)

 A proceeding under the SVPA is a special proceeding of a civil nature. (*People v. Superior Court (Cheek)* (2001) 94 Cal.App.4th 980, 988 [114 Cal.Rptr.2d 760].) In SVPA proceedings, "due process . . . is not measured by the rights accorded a defendant in criminal proceedings, but by the standard applicable to civil proceedings . . . ." (*People v. Superior Court (Howard)* (1999) 70 Cal.App.4th 136, 154 [82 Cal.Rptr.2d 481].) In civil proceedings, including SVPA proceedings, " '[d]ue process requires only that the procedure adopted comport with fundamental principles of fairness and decency. The due process clause of the Fourteenth Amendment does not guarantee to the citizen of a state any particular form or method of procedure.' [Citation.]" (*In re Parker* (1998) 60 Cal.App.4th 1453, 1462 [71 Cal.Rptr.2d 167].)

 The measure of due process that is due in civil proceedings, including proceedings under the SVPA, is a complex determination that depends upon several factors: "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (4) the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official." (*Otto, supra,* 26 Cal.4th at p. 210.) Here, even though an SVPA proceeding is a civil proceeding, due process requires the provision of a qualified expert for defendant. (See § 6603, subd. (a).) An SVP commitment directly affects a defendant's liberty interest. The provision of an expert allows a defendant the opportunity to present his side of the story before the trier of fact, which in turn reduces the risk of an erroneous deprivation of the defendant's liberty. With that said, there is nothing that militates in favor of providing two experts, who in all probability will proffer nothing more than cumulative testimony.[11] As the trier of fact is typically instructed, "Do not make any decision simply because there were more witnesses on one side than on the other. If you believe it is true, the testimony of a single witness is enough to prove a fact." (Judicial Council of Cal. Civ. Jury Instns. (2008) CACI No. 107.)

---

[11] Our record contains no offer of proof that a second expert could offer testimony different in nature from that of Dr. Donaldson.

Furthermore, none of the cases relied upon by defendant support the proposition that due process dictates the appointment of more than one expert to deal with the same issues. Here, defendant was fully able to present his side of the story to the trier of fact. Fundamental fairness was accorded.

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment is affirmed.

Gaut, Acting P. J., and Miller, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 9, 2009, S174311.

---

*See footnote, *ante*, page 186.