Filed 7/3/14  P. v. Hamm CA5

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>STEVEN MARK HAMM,<br><br>    Defendant and Appellant. | F067055<br><br>(Super. Ct. Nos. CF98917916-9,<br>CF96912986-7)<br><br>**O P I N I O N** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Gary D. Hoff, Judge.

Paul Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Heather S. Gimle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Cornell, Acting P.J., Poochigian, J., and Peña, J.

The trial court extended for one year the commitment of appellant, Steven Mark Hamm, as a mentally disordered offender (MDO) (Pen. Code, § 2960 et seq.)[1] after it sustained a petition pursuant to sections 2970 and 2972.  On appeal, Hamm contends the court's decision is not supported by substantial evidence.  We affirm.

## FACTS

On April 9, 1999, Hamm pled no contest to first degree robbery (§§ 211, 212.5, subd. (a)) and admitted a personal use of a knife enhancement (§ 12022, subd. (b)(1)).

On July 13, 1999, the court sentenced Hamm to a four-year term, the middle term of three years on his robbery conviction and a one-year weapon use enhancement.

On March 1, 2002, pursuant to section 2962, Hamm was committed to Atascadero State Hospital as a MDO.  Thereafter, he had his commitment extended several times.

On December 22, 2011, he was transferred from Napa State Hospital (the hospital) to the California State Prison at Sacramento (CSP-SAC) pursuant to Welfare and Institutions Code section 7301.

On September 24, 2012, the Fresno County District Attorney filed a petition seeking to again extend Hamm's involuntary commitment pursuant to sections 2970 and 2972.

On March 14, 2013, Hamm waived his right to a jury trial.

On March 27, 2013, at a court trial, the prosecutor called Dr. Timothea McGinley, a Senior Psychologist Supervisor for CSP-SAC, to testify as an expert witness regarding Hamm's mental status.  Dr. McGinley testified that Hamm was sent to the prison from Napa State Hospital for several reasons including assaulting other patients, attempting to take money from other patients, and destruction of state property.  In order to return to

---

[1]    Unless otherwise indicated all further statutory references are to the Penal Code.

2

the hospital Hamm had to remain free of any rules violations for a minimum of 12 months while housed at CSP-SAC in a mental health main line setting.

On May 25, 2012, and again on August 15, 2012, Hamm was admitted to a mental health crisis bed (MHCB) because on each occasion he reported having suicidal ideations.[2]

Hamm also received two rules violation reports (RVR) at the prison and both were found to be true. On May 30, 2012, he received a RVR for lunging at an officer while swinging a push broom in an aggressive manner. This incident occurred during a search of Hamm's cell that resulted in officers finding mash, an ingredient used in making pruno, an inmate-made alcoholic beverage.

On September 21, 2012, Hamm received a RVR for threatening an officer after some of Hamm's paperwork was stained with coffee during a search of his cell.

Dr. McGinley further testified that Hamm reported to a clinician that he heard voices speaking in tongues, i.e., saying things that were not understandable, and that he was not taking his medication. He also reported developing a non-profit church for the homeless and a drug rehabilitation center, businesses worth $1.9 million, while he was in prison. According to Dr. McGinley, these claims were grandiose delusions which often occur with mania. Hamm also reported other symptoms of mania including anxiety, racing thoughts, lack of concentration, and auditory and visual hallucinations.

Dr. McGinley prepared for her testimony by reviewing records relating to Hamm prepared by numerous clinicians and doctors from the hospital and the prison.[3] These

---

**2**      Dr. McGinley explained that an inmate admitted to a MHCB is evaluated every day by a mental health clinician, treated with appropriate medications, and not discharged back to their original housing unit until the inmate is no longer a threat to themselves or others.

**3**      Dr. McGinley did not personally conduct any tests on Hamm.

records included a focus psychological assessment from the hospital and records relating to Hamm's December 22, 2011, transfer to CSP-SAC. In reviewing these records Dr. McGinley noted that Hamm's diagnoses changed over time and that although hospital clinicians thought he might be malingering, they nevertheless kept him on antipsychotic and mood-stabilizing medications while at the hospital. The hospital reported many assaults and incidents where Hamm took advantage of other patients and that weighed in significantly in their diagnosis of antisocial personality disorder. Dr. McGinley also noted that several documents indicated that Hamm reported feeling people were after him and conspiring against him and they included observations by clinicians that he had paranoid ideation.

Based on her review of the records, Dr. McGinley found that Hamm "most likely fit a diagnosis of schizoaffective disorder bipolar type" which is a severe mental disorder, that was not in remission, and which made him a danger to others and at times to himself. In describing these disorders Dr. McGinley testified, "[W]ith schizoaffective disorder, the underlying issues would be the psychotic symptoms, the auditory hallucinations, the delusions, grandiose delusions, paranoid delusions, feeling people are after you. [¶] And then the bipolar type that goes along with schizoaffective disorder we discussed where you have the manic mood." She also testified that "Hypomania is a symptom of, bipolar disorder, bipolar 1 or 2. And essentially, hypomania or mania would be an excitable mood, an elevated mood. One -- a type of mood that you might see if someone was high on drugs, but yet they are not high on drugs. That is a hypomanic or manic mood. [¶] Oftentimes these people engage in risk taking behavior when they are in a manic episode. They might gamble, engage in … casual sex, or use drugs or sky dive or … go shopping, on huge shopping sprees. Sometimes, they can ... also become suicidal."[4]

---

[4] Dr. McGinley testified that Hamm likely also had a cognitive disorder, not otherwise specified.

In explaining her diagnosis of Hamm, Dr. McGinley stated that Axis I is typically reserved for more serious mental disorders like schizophrenia, mood disorders, depression, and bipolar disorder. Axis II is for long-standing personality disorders that interfere with a person's ability to interact with others in appropriate ways and are not treated as much by medication. Dr. McGinley further testified that the record showed an extensive history of substance abuse starting at the age of five or six that continued at the hospital and at CSP-SAC. This would be taken into account in his diagnosis of polysubstance abuse, depending on his clinician at the time.

Dr. McGinley opined that Hamm's mental disorder was not then in remission because even while on medication he still reported symptoms and engaged in aggressive behavior. According to his clinicians, under Axis II Hamm had antisocial personality disorder which was significant because it meant he was likely to continue to engage in violent behavior.

Per a progress note of January 10, 2013 by Hamm's last primary clinician, under Axis V Hamm received a global assessment of functioning (GAF) score of 42. The GAF is a scale clinicians use to rate how a patient is functioning. On a scale of 0 to 100 the higher your score, the better the patient is functioning. The GAF score of 42 indicated Hamm was categorized as having serious mental health symptoms that required frequent contact by mental health clinicians.

Dr. McGinley further testified that Hamm was being administered seven different medications including an antipsychotic and two for his mood disorder. If Hamm were to stop taking his antipsychotic medication he would likely have more psychotic symptoms such as hearing voices and experiencing delusions. If he were to stop taking medications for his mood disorder, Hamm would likely become more manic, more depressed, and there was a strong likelihood he would have more incidents of violence, threatening behavior and suicidal ideation.

At the hospital, Dr. White performed several tests on Hamm and found him to be malingering and that he did not meet the criteria for schizophrenia or schizoaffective disorder. On cross-examination, Dr. McGinley explained why she disagreed with Dr. White. According to Dr. McGinley, malingering is a diagnosis that changes over time. It does not necessarily mean the patient is not suffering any symptoms at all because the person could be exaggerating symptoms for secondary gain. Additionally, in prison multiple clinicians indicated that Hamm reported hearing voices and that he had paranoid ideation, grandiose delusions, and elevated mood; symptoms that are consistent with schizoaffective disorder, bipolar type. Further, even though clinicians at the hospital indicated Hamm was malingering, they continued to medicate him with antipsychotic and mood stabilizing medications. Dr. McGinley, however, did agree with Dr. White's assessment that Hamm was at high risk for recidivism.

In concluding Hamm was a danger to himself and others, Dr. McGinley noted that even though Hamm was medicated with mood stabilizers and antipsychotics he continued to engage in violent conduct toward officers in prison. She recommended a continued, extended commitment for Hamm and found it very necessary, especially considering that Hamm continued to engage in violence at a maximum security institution.

At the conclusion of the hearing the court extended Hamm's commitment for a year.

## DISCUSSION

Hamm contends that Dr. McGinley's diagnosis that he suffered from schizoaffective disorder, bipolar type did not constitute substantial evidence and does not support the judgment because: (1) it was merely a conclusion she repeated from the reports of other doctors; and (2) she did not discuss how she arrived at that diagnosis. We reject these contentions.

6

Under the Mentally Disordered Offender Act (the Act) (§ 2960 et seq.), when persons who have been convicted of a violent crime related to their mental disorders are eligible for release but currently pose a danger of harm to others, the Act permits their involuntary commitment to a state hospital for treatment until their disorders can be kept in remission. (*In re Qawi* (2004) 32 Cal.4th 1, 9.)

The Act provides treatment at three stages of commitment: as a condition of parole, in conjunction with the extension of parole, and following release from parole. (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1061 (*Lopez*).) "Sections 2970 and 2972 govern the third and final commitment phase, once parole is terminated. If continued treatment is sought, the district attorney must file a petition in the superior court alleging that the individual suffers from a severe mental disorder that is not in remission, and that he or she poses a substantial risk of harm. (§ 2970.)" (*Id*. at p. 1063.)

To obtain an extension, the district attorney must prove, and the trier of fact must find beyond a reasonable doubt, that (1) the person continues to have a severe mental disorder; (2) the person's mental disorder is not in remission or cannot be kept in remission without treatment; and (3) the person continues to represent a substantial danger of physical harm to others. (*Lopez, supra,* 50 Cal.4th at p. 1063; §§ 2970, 2972.)

"We review the court's finding on an MDO criterion for substantial evidence, drawing all reasonable inferences, and resolving all conflicts, in favor of the judgment. [Citations.]" (*People v. Martin* (2005) 127 Cal.App.4th 970, 975.)

""""[A]n expert may generally base his opinion on any 'matter' known to him, including hearsay not otherwise admissible, which may 'reasonably ... be relied upon' for that purpose. [Citations.] On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them.…"""" (*People v. Dean* (2009) 174 Cal.App.4th 186, 193.) "Psychiatrists, like other expert witnesses, are entitled to rely upon reliable hearsay, including the statements of the patient and other treating

7

professionals, in forming their opinion concerning a patient's mental state. [Citations.]" (*People v. Campos* (1995) 32 Cal.App.4th 304, 308.) On direct examination, the expert witness may testify that reports prepared by other experts were a basis for that opinion (*ibid.*) and he may rely on tests performed by other experts. (*Christiansen v. Hollings* (1941) 44 Cal.App.2d 332, 347.)

In support of the petition extending Hamm's commitment, the prosecution presented one expert, Dr. McGinley. Although Dr. McGinley did not interview or conduct any tests on Hamm, she reviewed numerous medical reports and other documents from the hospital and CSP-SAC. In addition to containing the diagnosis of Hamm by other clinicians, these documents also memorialized their observations of symptoms Hamm exhibited and his commission of offenses against two officers. Dr. McGinley concluded from her review of these documents that: (1) Hamm suffered from a severe mental disorder, i.e., schizoaffective disorder, bipolar type; (2) the disorder was not in remission; and (3) Hamm was a danger to others and to himself, especially if he stopped taking his antipsychotic and mood stabilizing medications.

Further, although Dr. McGinley referred to diagnoses of Hamm by other clinicians, it is clear from her testimony that her diagnosis of Hamm was her own and did not consist merely of repeating other clinicians' diagnoses.[5]

---

[5] Hamm cites *People v. Campos*, *supra*, 32 Cal.App.4th 304 to contend that on direct examination an expert cannot reveal the contents of reports prepared or opinions expressed by nontestifying experts. (*Id.* at p. 308.) However, this rule is inapplicable to a court trial (*People v. Martin*, *supra*, 127 Cal.App.4th at p. 977) and, in any event, Hamm waived any objection to the introduction of this evidence by his failure to object (Evid. Code, § 353, subd. (a)). Additionally, we note that "hearsay evidence is competent and relevant in the absence of a specific hearsay objection [citation]." (*People v. Rodriquez* (1969) 274 Cal.App.2d 770, 776.)

Hamm also contends Dr. McGinley's diagnosis of him is not supported by facts and reasoning because she never described her methodology for arriving at her diagnosis or how she applied her methodology. Thus, according to Hamm, her opinion does not constitute substantial evidence that supports the judgment. Hamm is wrong.

Dr. McGinley's methodology involved reviewing the numerous reports and information that had been generated by the hospital and CSP-SAC and rendering an opinion on whether Hamm suffered from a severe mental disorder, that was not in remission, and that made him a danger to others. In doing so, she took into account, among other things, the symptoms Hamm was reported to have exhibited and the two incidents underlying the RVR's Hamm received. As an expert witness Dr. McGinley was entitled to base her opinion on this type of information and the hearsay reports of others in rendering an opinion on Hamm's mental state. However, she was not required, as Hamm suggests, to personally evaluate him in order to render her opinion.[6]

Hamm also complains that Dr. McGinley did not actually diagnose him with schizoaffective disorder, bipolar type. He bases this contention on Dr. McGinley's testimony that Hamm "most likely fit a diagnosis of schizoaffective disorder bipolar type[,]" and that "based on [her] review of what other clinicians within [CSP-SAC] had summarized, ... schizoaffective disorder, bipolar type seemed to fit." Additionally, when asked if she had an expert opinion whether or not Hamm had a severe mental disorder she replied, "According to [her] review of the records, it looks like he qualifies for a diagnosis of schizoaffective disorder, bipolar type, yes." Dr. McGinley's testimony could have been more direct. Nevertheless it is clear from her testimony that she diagnosed Hamm with schizoaffective disorder, bipolar type.

---

**6** Hamm also contends that Dr. McGinley did not provide a "definition" for his mental disorders. This contention, however, ignores her testimony quoted earlier that describes schizoaffective disorder and bipolar disorder.

Hamm also contends that Dr. McGinley did not clarify that Hamm's mental disorder made him a danger to others because in stating her opinion she testified on two separate occasions that Hamm represented a "substantial danger to others or himself."[7] In doing so, however, he ignores Dr. McGinley's unequivocal testimony during redirect examination that Hamm represented a "danger to others and at times to himself." Thus, we conclude that substantial evidence supports the court's decision sustaining the petition extending Hamm's involuntary treatment pursuant to sections 2970 and 2972.

## **DISPOSITION**

The judgment is affirmed.

---

[7] Hamm bases this contention on the statutory language requiring that a defendant represent "a substantial danger of physical harm to others" before his commitment can be extended. (§ 2972, subd (c).)