Filed 10/30/13  Steiner v. Volkswagen Group of America CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| CHRISTIE STEINER, as successor in interest, etc., <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> VOLKSWAGEN GROUP OF AMERICA, INC., et al., <br><br>     Defendants and Respondents. | 2d Civil No. B236532 <br> (Super Ct. No. 1374169) <br> (Santa Barbara County) |
| CHRISTIE STEINER, as successor in interest, etc., <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> VOLKSWAGEN GROUP OF AMERICA, INC., et al., <br><br>     Defendants and Appellants. | 2d Civil No. B240488 |

Plaintiff Richard Steiner (Steiner) contracted terminal lung cancer.  He was a longtime smoker and, early in his life, worked with motor vehicle parts that purportedly contained asbestos.  He contended that the effect of his smoking was profoundly

exacerbated by his exposure to the asbestos, resulting in his cancer. Steiner and his wife, Christie Steiner, brought a personal injury action against a number of automobile parts manufacturers, including defendants Volkswagen Group of America, Inc. (Volkswagen), Ford Motor Co. (Ford), Nissan North America, Inc. (Nissan) and Pneumo-Abex Corp. (Pneumo-Abex). The trial was a "battle of experts."[1] Plaintiffs contend they were hamstrung by the trial court's rulings limiting the scope of their cross-examination of the defense experts. Our examination of the record leads to a contrary conclusion.

Plaintiffs' causation expert testified that Steiner's exposure to both tobacco and asbestos created a "synergistic effect," increasing Steiner's risk of lung cancer by as much as 50-fold. Defendants' causation experts agreed that asbestos, in sufficient doses, can increase a smoker's risk of lung cancer, but determined Steiner's exposure was insufficient to cause such a "synergistic effect." The defense pathologist, radiologist and pulmonologist testified that Steiner's lung tissue, x-rays and scans displayed substantial physical changes due to smoking, but none of the changes typically associated with asbestos exposure. The defense epidemiologist opined that even career automobile mechanics do not have an increased risk of lung cancer from asbestos exposure. Plaintiffs cross-examined these experts extensively, but offered no pathologist, radiologist, pulmonologist or epidemiologist to counter their opinions.

Following a six-week trial, the jury returned a defense verdict on all issues. Plaintiffs do not challenge the sufficiency of the evidence to support the verdict.[2] They contend the trial court abused its discretion by prohibiting their causation expert's discussion of hearsay scientific literature and studies on direct examination pursuant to Evidence Code section 802,[3] and by limiting plaintiffs' cross-examination of the defense experts as to certain hearsay literature and studies under section 721, subdivision (b)(1).

---

[1] See *Edwards v. Superior Court* (1976) 16 Cal.3d 905, 918-919, fn. 6 (conc. & dis. opn. of Sullivan, J.).

[2] Richard Steiner died shortly after the trial. Christie Steiner has been substituted as his successor in interest and thus is the only remaining plaintiff.

[3] All statutory references are to the Evidence Code unless otherwise stated.

2

The record does not support plaintiffs' assertion that these limitations, combined with other erroneous evidentiary rulings, deprived them of a fair trial.

Following the verdict, Volkswagen and Ford claimed their expert witness fees as an item of costs based on plaintiffs' rejection of their pretrial offers to compromise under Code of Civil Procedure (CCP) section 998. The trial court granted plaintiffs' motion to tax the expert witness fees, concluding that the respective offers of $2,202 and $5,000 were not reasonable or made in good faith. Volkswagen and Ford fail to show that the court abused its discretion in striking the fees.[4] We affirm both the judgment and the order taxing the expert witness fees.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1976, Steiner took a high school auto repair class in which he learned how to repair and replace brakes, clutches and engine gaskets. Steiner applied these lessons while working part-time at a gas station for seven months in 1978 and for ten months in 1980. He also worked on cars owned by family and friends between approximately 1977 and 1985. At that time, friction products, such as brake linings, clutch facings and engine gaskets, normally contained asbestos.

Steiner began smoking at age 20 and continued for the next 30 years. He smoked approximately a half pack to a pack of cigarettes a day. In 2009, at the age of 49, he was diagnosed with squamous cell carcinoma of the right lung, and underwent numerous treatments, including removal of the lung. Steiner claimed he stopped smoking shortly after the diagnosis.

In March 2010, Steiner and his wife filed a personal injury action against Volkswagen, Ford and other manufacturers or distributors of automotive parts, alleging that Steiner's exposure to asbestos in automotive brakes, clutches and engine gaskets caused his lung cancer. Seven months later, Volkswagen served plaintiffs with individual

---

[4] Volkswagen and Ford filed their consolidated appeal from the order taxing the expert witness fees (No. B240488) after plaintiffs appealed from the judgment (No. B236532). The briefs in both appeals cite extensively to the 30-volume reporter's transcript filed in plaintiffs' appeal. On our own motion, we consolidated the two appeals for purposes of decision only.

offers to compromise under CCP section 998.  Volkswagen offered to settle Steiner's claims for $1,501 and Christie Steiner's claims for $501, plus a waiver of costs. Volkswagen based the offers on "Steiner's medical records showing no asbestos markers, [his] deposition testimony lacking a showing of exposure to parts distributed by Volkswagen, and [his] Social Security records."  Plaintiffs declined the offers.

Approximately two months before trial, Ford made similar statutory offers to compromise, offering Steiner $4,000, and Christie Steiner $1,000, plus a complete waiver of all costs and attorney fees.  Plaintiffs rejected the offers, declaring they were "not in good faith given the seriousness of the disease, the scientific literature tying lung cancer to asbestos exposure, [Steiner's] age and shortened life expectancy, and shortened work life."

*Trial Testimony and Verdict*

The trial began in August 2011 with only Ford, Volkswagen, Nissan and Pneumo-Abex as remaining defendants.  Through his videotaped deposition, Steiner testified that he typically worked on used cars.  He recalled using replacement brake or clutch parts made or sold by defendants, and stated that the work generated dust which he inhaled.

Plaintiffs did not dispute that Steiner's smoking was a causative factor in his diagnosis.  The primary issue was whether Steiner's lung cancer was caused solely by smoking or by a "synergistic" combination of smoking and asbestos exposure.  Plaintiffs presented four experts:  Carl Brodkin, M.D., an expert in occupational medicine; Arnold Brody, Ph.D., a cell biologist; Gerald Deutsch, M.D., an addiction specialist; and Steiner's thoracic surgeon, Robert Cameron, M.D.  Only Dr. Brodkin testified as a causation expert.

Dr. Brodkin testified that Steiner's exposure to both tobacco and asbestos acted synergistically to increase his risk of lung cancer by as much as 50-fold.  Dr. Brodkin based this opinion on Steiner's history of occupational asbestos exposure, as stated in Steiner's deposition testimony, and on the "biapical" pleural thickening of the tissue at the apex of Steiner's lungs, which Dr. Brodkin said is consistent with asbestos

4

exposure. Drs. Brody and Cameron generally agreed that a combination of smoking and asbestos can increase the risk of lung cancer, but expressed no opinion on whether that actually occurred in Steiner's case. Dr. Brody was not retained for that purpose, and Dr. Cameron's role was to treat Steiner's cancer, not to determine its cause.

Dr. Cameron testified he saw no evidence of asbestosis when he removed Steiner's right lung. He also found no evidence of pleural calcifications -- a marker of asbestos exposure. Nor were there any objective signs of asbestos exposure in the pathology reports. Steiner's lung did evidence chronic obstructive pulmonary disease (COPD) and emphysema, which are consistent with smoking damage. Although he had no opinion on whether asbestos was a causative factor in Steiner's cancer, Dr. Brody conceded "the overwhelming majority of people who change brakes don't get lung cancer."

Defendants presented four causation experts: Victor Roggli, M.D., a pathologist; David Godwin, M.D., a radiologist; Allan Feingold, M.D., a pulmonologist specializing in smoking-related diseases; and Patrick Hessel, Ph.D., an epidemiologist. These experts uniformly agreed that exposure to asbestos can cause lung cancer, but only "in sufficient doses." In their opinion, Steiner's exposure to asbestos during his relatively short tenure as a vehicle mechanic was insufficient to cause his lung cancer, which they believed was caused entirely by smoking.

Dr. Roggli testified, based on his own assessment of Steiner's pathology, that the pleural thickening described by Dr. Brodkin was the type caused by smoking, not by asbestos exposure. He concluded that Steiner's pathology revealed changes in the lung that clearly were associated with cigarette smoking, including respiratory bronchiolitis, emphysema and apical fibrous cap. He did not find any evidence of asbestosis or any signs of asbestos bodies in the pathology slides. Dr. Roggli further observed that "there's no convincing evidence that friction products cause lung cancer, in general."

Dr. Godwin specializes in examining radiographic material for signs of pneumoconiosis, i.e., lung disease caused by the inhalation of dust, such as asbestos.

5

Based on his personal review of Steiner's chest x-rays, CT scans and PET scans, Dr. Godwin opined there was no "radiographic evidence of asbestos exposure." He found no indication of asbestosis or pleural placques, pleural calcification and diffuse pleural thickening, which typically evidence asbestos-related disease.

Dr. Feingold, the defense pulmonologist, displayed photomicrographs revealing the characteristic markers of smoking on Steiner's lungs. He also saw no signs of asbestosis, pleural placques or asbestos bodies in the lung tissue. Dr. Feingold explained: "I know that asbestos does increase the risk of lung cancer in individuals who have significant asbestos exposure, sufficient asbestos exposure to cause asbestosis. [Steiner] did not have that kind of exposure and, therefore, asbestos did not contribute to his lung cancer." Dr. Feingold was a "hundred percent certain" that Steiner's cancer was caused exclusively by smoking.

Experts on both sides agreed that epidemiology is "the gold standard in order for doctors in science to find out whether or not a substance has an impact on a population of people." Defendants' epidemiologist, Dr. Hessel, testified that although epidemiologic studies confirm that smokers are at an increased risk for lung cancer over the general population, the studies do not suggest that asbestos exposure from vehicle repair work "synergistically" increases a smoker's lung cancer risk. Dr. Hessel explained that because there is zero increased risk associated with vehicle repair work in general, "then multiplying that [zero] times the smoking risk still gives you the [same] smoking risk."

In the absence of their own pathologist, radiologist, pulmonologist or epidemiologist, plaintiffs had difficulty countering the defense experts' opinions and, on occasion, even deferred to those opinions. For example, when told that Dr. Roggli had found no pathological evidence suggesting that asbestos was a causative factor in Steiner's cancer, plaintiffs' cell biology expert, Dr. Brody, replied: "Well, I would not dispute a diagnosis by Victor Roggli or a number of other eminent pathologists. That's not my position."

6

After six weeks of trial, the jury returned a complete defense verdict. Plaintiffs appeal from the judgment.

*Post-Judgment Motions to Tax Costs*

Following trial, Volkswagen filed a memorandum seeking costs of $435,439.15, which included expert witness fees of $228,826.26. Ford claimed costs of $992,202.36, which included $174,565.29 in expert witness fees. Plaintiffs moved to tax the expert witness fees and other costs. Plaintiffs contended the offers to compromise were token offers, made in bad faith with no reasonable expectation of acceptance.

In a detailed written decision, the trial court awarded $164,889.90 in costs to Volkswagen and $59,892.69 to Ford. Striking all the expert witness fees, the court determined the CCP section 998 "offers were not reasonable or in good faith." The court noted that Volkswagen's offer was made early in the case, before plaintiffs had received any discovery from Volkswagen, and before they knew how their case may develop as to Volkswagen. The court concluded that "[u]nder the facts then available to the parties, Volkswagen would not reasonably believe that plaintiffs would consider their causation theory as remote."

Acknowledging that Ford's offer was made closer to trial, the trial court determined that the offer was very low compared with the potential liability of $2.4 to $2.9 million identified by plaintiffs' economist during his deposition. The court stated: "Given the high potential damages, the offer would only have been reasonable if plaintiffs considered the likelihood of their proving causation to be very small or remote. . . . Plaintiffs did not view their likelihood of proving causation as remote, and while plaintiffs' causation theory may have been attenuated, it was not unreasonable." Volkswagen and Ford appeal from the order taxing the expert witness fees.

DISCUSSION

*Plaintiffs' Appeal*

1.      *Standard of Review*

We review the trial court's evidentiary rulings for an abuse of discretion. (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo*

7

*Valley Unified School Dist*. (2006) 139 Cal.App.4th 1356, 1419.) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, overruled on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Even when evidence has been improperly excluded, reversal is only proper where there is a reasonable probability that a more favorable result would have been reached. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431–1432 (*Tudor Ranches*).)

    2.        *Exclusion of Evidence During Dr. Brodkin's Direct Examination*

Plaintiffs contend the trial court violated section 802 by precluding their causation expert, Dr. Brodkin, from testifying on direct examination that certain hearsay scientific literature and studies supported his opinion that Steiner's lung cancer was causally connected to his occupational asbestos exposure. They claim that without this supporting information, Dr. Brodkin's opinion had virtually no value, giving the jury the impression he was "just making it up."

As both sides point out, Dr. Brodkin is a highly qualified expert in his field of occupational and environmental medicine, with an emphasis on asbestos-related diseases and other occupational lung disorders. He has published numerous scientific articles and studies, including a study that showed that with increasing exposure to asbestos, a risk for developing lung cancer increases significantly. Plaintiffs acknowledge that Dr. Brodkin was permitted to present his full qualifications, all of his opinions and virtually all of the bases for his opinions. The question is whether the trial court should have given him more leeway to identify and generally describe the hearsay scientific literature and studies and, if so, whether it would have created a reasonable probability of a more favorable result for plaintiffs. (See *Tudor Ranches, supra,* 65 Cal.App.4th at pp. 1431-1432.)

Section 802 provides that an expert "may state on direct examination the reasons for his opinion and the matter . . . upon which it is based . . . ." (See *People v.*

8

*Catlin* (2001) 26 Cal.4th 81, 137.)  Hence, a physician expert "may rely upon medical texts as the basis for his testimony.  [Citations.]"  (*Brown v. Colm* (1974) 11 Cal.3d 639, 644, fn. omitted; see *People v. Bui* (2001) 86 Cal.App.4th 1187, 1196 [expert may rely on scientific literature, statistical data, and an epidemiological study for his opinions].)  But this rule may not be used as a vehicle to bring before the jury incompetent evidence. (*People v. Dean* (2009) 174 Cal.App.4th 186, 201 (*Dean*); see *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 788-789 (*Grimshaw*).)  "Although an expert 'may rely on inadmissible hearsay in forming his or her opinion [citation], and may state on direct examination the matters on which he or she relied, the expert may not testify as to the details of those matters if they are otherwise inadmissible [citation].'  [Citations.]" (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524-1525.)

A trial court "has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay."  (*People v. Price* (1991) 1 Cal.4th 324, 416.)  Here, the trial court allowed Dr. Brodkin to rely on hearsay in rendering his opinions on direct examination, but for the most part, would not permit him to recount that hearsay in his testimony.  The court clarified several times that Dr. Brodkin could testify about materials from the literature and studies that he had adopted as his own opinions, but could not recite to the jury the conclusions of the literature or studies themselves.  The court instructed:  "Let's be sure that we're clear on it.  I don't want to -- and he's done it at least once, said that `based upon the medical literature.'  I understand he can rely on it, but I want to hear his opinion, not what's in the medical literature."

Plaintiffs do not claim the trial court should have allowed Dr. Brodkin to recite or quote the contents of the hearsay literature and studies.  Relying primarily on *Grimshaw, supra*, 119 Cal.App.3d 757, and *Notrica v. State Compensation Ins. Fund* (1999) 70 Cal.App.4th 911 (*Notrica*), plaintiffs assert the court should have permitted Dr. Brodkin "to actually *identify* the publications he referenced and to generally discuss the findings of the studies in order to demonstrate that his opinions had objective support in the literature."

9

It is true that, in some circumstances, appellate courts have upheld the trial court's discretion to allow an expert more latitude in describing hearsay while rendering opinions on direct examination. (E.g.*, Notrica, supra,* 70 Cal.App.4th at pp. 932-933 [permitting expert to recite excerpts of a hearsay article "when context is needed [for the jury] to understand what has transpired"].) In other circumstances, appellate courts have held the trial court abused its discretion by allowing an expert to testify about hearsay records. (E.g., *Dean, supra,* 174 Cal.App.4th at pp. 200-201 ["[U]nder the guise of supporting her opinion, [the expert's] testimony improperly brought before the jury incompetent hearsay evidence"].) The key is the trial court must "weigh the probative value of inadmissible evidence . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein." (*People v. Coleman* (1985) 38 Cal.3d 69, 91, disapproved on another point in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.) "Within this context, 'probative value' refers to . . . the relative reliability of the inadmissible evidence and its necessity to the jury's understanding of the credibility and bases for the expert opinion." (*Dean,* at p. 199.)

Although plaintiffs expressed frustration over the trial court's decision to limit Dr. Brodkin's direct examination under section 802, they did not specifically request that he be allowed to identify the medical literature or studies, such as by title or author, and to generally describe their contents. Nor did they make an offer of proof as to what such evidence would have revealed. As a result, the trial court never addressed the relative reliability of this evidence, the potential value to the jurors' understanding of Dr. Brodkin's opinion and the risk that the jurors would consider the evidence for an improper purpose. (See *Dean, supra*, 174 Cal.App.4th at p. 199.) We decline to do so on appeal. "A judgment cannot be set aside on the ground that the court erroneously excluded evidence unless the substance, purpose and relevance of the excluded evidence were made known to the court by an offer of proof or by other means." (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1113.)

Plaintiffs argue that even if the trial court properly applied section 802 to the questioning of Dr. Brodkin, the court abused its discretion by holding the defense

10

experts to a standard different from the one applied to plaintiffs' experts. A review of the expert testimony as a whole belies this claim. The examples cited by plaintiffs typically (1) concerned literature or studies authored by the defense expert, and thus within his personal knowledge, (2) occurred when the expert was discussing publications raised by plaintiffs on cross-examination, (3) did not reveal the actual content of the publications, or (4) involved testimony that was admitted without objection.[5]

By way of illustration, plaintiffs complain "the trial court said to [Dr.] Hessel exactly the opposite of what he said to Dr. Brodkin: 'Obviously, your opinion can be backed up with what you perceive the studies to say . . . .'" But the full quotation reveals the instruction was entirely consistent with the instructions to Dr. Brodkin: "Dr. Hessel, please, when you answer these kind[s] of questions, remember I'm interested in your opinion, not what the studies might show. Your opinion, please. . . . [¶] Obviously, your opinion can be backed up with what you perceive the studies to say, *but talk to us about what your opinion is*." (Italics added.) A short while later, the court again reminded Dr. Hessel: "Obviously, you've read the literature, obviously you relied on the literature, but I don't want you to tell me what the literature says . . . ." This example fairly represents the consistency of the trial court's rulings on the section 802 objections.

*3.        Exclusion of Evidence on Cross-Examination of Defense Experts*

Plaintiffs assert that in addition to improperly limiting Dr. Brodkin's direct examination, the trial court incorrectly and prejudicially limited their cross-examination of Drs. Roggli, Hessel and Feingold regarding certain hearsay scientific literature and studies. Section 721, subdivision (b) identifies three instances in which an expert witness may be cross-examined regarding the *content or tenor* of a scientific, technical or professional text, treatise or journal.[6] At issue here is subdivision (b)(1), which allows

---

[5] Plaintiffs made virtually no section 802 hearsay objections to Dr. Roggli's direct examination, and thus waived that issue on appeal. (See *Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139-140 [failure to object to an evidentiary ruling waived the argument on appeal].)

[6] Section 721, subdivision (b), provides: "If a witness testifying as an expert testifies in the form of an opinion, he or she may not be cross-examined in regard to the

11

cross-examination when "[t]he witness referred to, considered, or relied upon such publication in arriving at or forming his or her opinion." (§ 721, subd. (b)(1).)

Plaintiffs extensively cross-examined all three experts,[7] but claim the trial court should have permitted cross-examination regarding scientific literature and studies with which they are generally familiar, even if they did not refer to, consider or rely upon them in forming their opinions. Defendants correctly respond that mere familiarity with the scientific literature is not enough. Although plaintiffs need not show that the expert relied upon a particular publication in forming the opinion, they must lay a foundation showing that the expert at least referred to or considered it in forming that opinion. (§ 721, subd. (b)(1).)

"[T]he purpose of section 721(b) is 'to prevent an adverse party from getting before the trier of fact the *inadmissible hearsay* views of an *absent* expert, which may be *contrary* to the expert witness' opinion, through the device of cross-examining the expert witness regarding the absent expert's publication or report even though the testifying expert had *not* used or considered that publication or report in *any* way in arriving at or forming his opinion testimony.'" (*McGarity v. Department of Transportation* (1992) 8 Cal.App.4th 677, 683 (*McGarity*), quoting 2 Jefferson, Evidence Benchbook (2d ed. 1982) § 29.8, p. 1036, original italics.) Permitting such cross-examination would bring before the jury the opinions of absentee authors without the safeguard of cross-examination. (*Id.* at p. 683.) As reflected in the Law Revision comment to section 721, "it is important to permit an expert witness to be cross-examined concerning those publications referred to or considered by him even though not specifically relied on by him in forming his opinion. An expert's reasons for not relying

content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication unless any of the following occurs: [¶] (1) The witness referred to, considered, or relied upon such publication in arriving at or forming his or her opinion. [¶] (2) The publication has been admitted in evidence. [¶] (3) The publication has been established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. [¶] If admitted, relevant portions of the publication may be read into evidence but may not be received as exhibits."

[7] The testimony of these experts spanned five days. Their cross-examinations comprise 689 pages of the reporter's transcript; the direct examinations total 395 pages.

12

on particular publications that were referred to or considered by him *while forming his opinion* may reveal important information bearing upon the credibility of his testimony." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) § 721, p. 348, italics added.)

In *McGarity, supra,* 8 Cal.App.4th at page 680, the defendant's accident reconstruction expert estimated the speed of the vehicle at the time of the crash at issue in the case. On cross-examination, the trial court excluded a vehicle crash test report that the expert had not referred to, considered or relied on in forming his opinion. (*Id.* at pp. 681-682.) The appellate court determined the expert's reference to other crash tests did "not open the door to cross-examination with tests of the same generic nature which the witness did not refer to, consider, or rely upon . . . ." (*Id.* at p. 684; see *People v. Visciotti* (1992) 2 Cal.4th 1, 80-81.)

To support their broader interpretation of section 721, subdivision (b)(1), plaintiffs cite *People v. Ledesma* (2006) 39 Cal.4th 641, 695, and *People v. Clark* (1993) 5 Cal.4th 950, 1013 (*Clark*), overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22. As defendants point out, *Ledesma* referred to the scope of expert cross-examination in general, as set forth in section 721, subdivision (a), and did not address the limits of permissible cross-examination regarding scientific literature and studies specified in subdivision (b). (*Ledesma*, at p. 695.)

*Clark* also did not address whether section 721, subdivision (b)(1) requires admission of scientific literature or studies with which an expert is generally familiar. (*Clark*, *supra,* 5 Cal.4th at p. 1013.) In one paragraph of a lengthy death penalty opinion, the court determined it was "permissible" under the circumstances to allow the prosecution to cross-examine the defense psychiatric expert with a "scholarly article" written by a psychiatrist formerly associated with the witness. (*Ibid.*) A trial court's failure, however, to do what is "permissible" does not constitute an abuse of discretion. (See *People v. Guerra, supra,* 37 Cal.4th at p. 1113.)

13

*a.*  *Cross-Examination of Drs. Hessel and Roggli*

While Dr. Hessel was working at a consulting firm called Exponent, Ford and two other automobile manufacturers commissioned Exponent to examine whether vehicle mechanics have a higher rate of asbestos diseases than the general population. In 2004, Dr. Hessel and his Exponent colleagues published two epidemiological studies concluding that vehicle mechanics do not experience higher rates of asbestos disease as a result of working with friction products. A year later, another epidemiologist, Dr. David Egilman, criticized the Exponent studies in an article entitled "Abuse of Epidemiology: Automobile Manufacturers Manufacture a Defense to Asbestos Liability" (Egilman article).

In the absence of Dr. Egilman or any other epidemiologist, plaintiffs attempted to introduce Dr. Egilman's opinions through the defense experts. On cross-examination, Dr. Hessel acknowledged that the Egilman article criticized the Exponent studies, and stated he did not consider, refer to or rely on the article in forming his opinions in this case.

Unlike in *Clark*, the Egilman article was not written by a colleague formerly associated with Dr. Hessel. It was written by an epidemiologist who disagreed with the conclusions reached by Dr. Hessel and others in the Exponent studies. As noted above, section 721, subdivision (b)(1) precludes a party from introducing the inadmissible hearsay views of an absent expert unless the testifying expert used or considered the absent expert's publication in forming his opinion testimony. (*McGarity, supra,* 8 Cal.App.4th at p. 683.) Dr. Hessel explained that he read and discounted the Egilman article when it was published in 2005, calling it a "horrible piece of work." Plaintiffs failed to show that Dr. Hessel, some six years later, considered or used the article in arriving at his opinions in Steiner's case.

Similarly, Dr. Roggli testified that he was familiar with the Egilman article, but had never relied on, quoted or referred to it in any of his publications, reports or opinions. Plaintiffs cross-examined Dr. Roggli extensively about chapters in his book, "Pathology of Asbestos-Associated Diseases," and about a number of other publications,

14

but did not establish that Dr. Roggli used or considered the Egilman article in forming his opinions in this case. By excluding cross-examination regarding the Egilman article, the trial court appropriately prevented plaintiffs from using an adversary's expert witness as nothing more than a proxy for the introduction of evidence of the opinions of another which do not meet the statutory requirements. Any other approach would turn that expert witness into little more than a "Google" search. (See *McGarity, supra,* 8 Cal.App.4th at p. 684; *People v. Criscione* (1981) 125 Cal.App.3d 275, 285-286.)

The same is true of a 2009 fact sheet on asbestos published by the National Cancer Institute. Dr. Hessel testified that he was "not intimately familiar with it," and thus would have to read the sheet before commenting on it. Without any showing that Dr. Hessel had used or considered the sheet in forming his opinions, the trial court properly excluded it under section 721, subdivision (b)(1).

   *b.*    *Cross-Examination of Dr. Feingold*

Defense pulmonologist, Dr. Feingold, prepared a 182-page report with a bibliography listing 113 studies and publications. Plaintiffs claim that because Dr. Feingold's report "refers to" these 113 publications, they all were subject to cross-examination under section 721, subdivision (b)(1). Dr. Feingold testified that he did not refer to, consider or rely on all of the bibliographical references in forming his opinions in this case. He said he included some of the references strictly for historical purposes. When asked about two articles from 1976 discussing asbestos exposure in brake workers, Dr. Feingold said that perhaps he would have relied on them in 1976, but that they are no longer valid given more recent studies. He elaborated that each "article [was] included for identification. It is certainly not included because I've recently considered it or read it at any time in the last decade, or relied upon it. I did not rely upon it, and I should not have."

Dr. Feingold gave essentially the same testimony with respect to two U.S. Surgeon General reports from 1964 and 1989. He explained that by 2001, more accurate information had become available, superseding earlier literature and studies. The trial court did not abuse its discretion in disallowing further discussion. Dr. Feingold

15

emphatically discounted the articles as outdated, and as plaintiffs acknowledge, defense counsel would have underscored that very point on re-direct examination. Trial courts reasonably may restrict cross-examination where marginally relevant testimony will result in an undue consumption of time or confusion of the issues, among other concerns. (See § 352; *People v. Harris* (1989) 47 Cal.3d 1047, 1090-1091.)

Plaintiffs contend the trial court improperly excluded cross-examination regarding "current governmental regulations" applicable to asbestos exposure. Plaintiffs do not disclose in their brief that the trial court previously had granted a defense motion in limine excluding that specific evidence. After Dr. Feingold referenced the "current concept" of asbestos exposure during direct examination, plaintiffs claimed defendants had opened the door for cross-examination. The trial court disagreed, explaining that when an in limine ruling is in place, the parties should immediately "get me to the side-bar, and I'll stop it right then, but to let it come in, and then say, 'Now they've opened the door' is not something that I'm going to embrace." Consistent with that decision, and at plaintiffs' request, the trial court struck the inappropriate comment from the record and admonished the jury not to consider it for any purpose. There was no abuse of discretion.

Plaintiffs also complain the trial court incorrectly prohibited them from reading from publications that were qualified for cross-examination under section 721, subdivision (b). The cited record references do not support that claim. After initially instructing plaintiffs' counsel not to read directly from Dr. Roggli's textbook, the trial court reversed itself and allowed counsel to read substantial portions of the textbook during Dr. Feingold's cross-examination.

4.       *Admission of Smoking Video*

During trial, defendants produced a surveillance video obtained from the insurer in a separate workers' compensation case filed by Steiner. The video showed Steiner briefly smoking a cigarette on June 19, 2011 -- six months after testifying at his deposition that he had ceased smoking shortly after he was diagnosed with lung cancer. Plaintiffs assert the trial court prejudicially abused its discretion by admitting the video.

16

They claim the video had no probative value, was highly prejudicial and thus should have been excluded under section 352. We are not persuaded.

First, plaintiffs incorrectly assert that the video was not disclosed in discovery or on the defendants' exhibit list. As defendants point out, a non-party insurer conducted the video surveillance in an unrelated matter a short time before trial. That party produced the video to all parties at the same time under a subpoena previously approved by the trial court and discovery referee. There was no surprise.

Second, the evidence was relevant, as it related to the causation element of plaintiffs' failure-to-warn claims in that it showed Steiner continuing to smoke after his cancer diagnosis. It also had a bearing on Steiner's credibility, which was central to plaintiffs' case. Dr. Brodkin's opinion that Steiner's cancer was caused by a synergistic combination of tobacco and asbestos exposure was based largely on Steiner's historical account of his smoking and vehicle repair work. Just two days before the video was taken, Steiner told Dr. Brodkin that he had given up smoking no later than November 2009. The video was relevant to assist the jury in deciding the appropriate weight to accord Dr. Brodkin's testimony given his reliance on Steiner's representations.

Finally, "[s]ection 352 does not . . . allow for the exclusion of evidence *merely* because it is 'prejudicial' in the sense of damaging to a litigant's position. The relevant phrase from the statute is 'substantial danger of *undue* prejudice.'" (*O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 575.) Plaintiffs have not shown that the admission of the video was unduly prejudicial, particularly given its relevance to Steiner's claims and credibility.

5.      *Cumulative Error*

Plaintiffs contend the cumulative effect of the purported evidentiary errors undermined the fundamental fairness of the trial. Having either rejected plaintiffs' claims of error on the merits or found any assumed errors to be nonprejudicial, we reach the same conclusion with respect to the cumulative effect of any purported erroneous evidentiary rulings. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236.) The claimed errors are insignificant in light of the substantial expert evidence that Steiner's

17

lung cancer was caused exclusively by smoking. Our review of the record in its entirety demonstrates that the trial court was consistent in its rulings.

6. *Appointment of Discovery Referee*

Plaintiffs challenge the trial court's appointment of a discovery referee and allocation of the referee's fees. Although plaintiffs initially objected to the appointment of a discovery referee because of the costs involved, they ultimately agreed to the appointment and to the allocation/apportionment of the referee's fees. Plaintiffs' failure to object in the trial court constitutes a waiver of the issue on appeal. (*Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1227.)

*Volkswagen and Ford's Consolidated Appeal*

1. *Standard of Review*

Volkswagen and Ford agree that "'[w]hether a [CCP] section 998 offer was reasonable and made in good faith is a matter left to the sound discretion of the trial court, and will not be reversed on appeal except for a clear abuse of discretion.' [Citation.]" (*Najera v. Huerta* (2011) 191 Cal.App.4th 872, 877 (*Najera*).) The appellant bears the burden "'. . . to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' [Citations.]" (*Denham v. Superior* Court (1970) 2 Cal.3d 557, 566.) To satisfy that burden, the appellant must show that the trial court exercised its discretion "in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*Najera*, at p. 877.)

2. *Order Taxing Expert Witness Fees*

Under CCP section 998, subdivision (c)(1), if a plaintiff does not accept a defendant's settlement offer and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff must pay the defendant's post-offer costs. In addition, the court, in its discretion, may require the plaintiff to pay a reasonable sum to cover expert witness fees. (*Ibid.*)

18

CCP section 998 is a cost-shifting statute, the purpose of which is to encourage pretrial settlements and avoid needless litigation. (*Barba v. Perez* (2008) 166 Cal.App.4th 444, 451.) Nevertheless, the courts must apply this section in a manner that best promotes its purpose. (*Guerrero v. Rodan Termite Control, Inc.* (2008) 163 Cal.App.4th 1435, 1440.) This purpose is not accomplished by permitting the defendant to recover costs in every case where the plaintiff fails to recover more than the defendant's offer. (*Ibid.*) To advance the legislative purpose of encouraging settlement, a good faith requirement must be read into CCP section 998. (*Ibid.*) "Good faith . . . requires that the settlement offer be 'realistically reasonable under the circumstances of the particular case.'" (*Adams v. Ford* (2011) 199 Cal.App.4th 1475, 1483 (*Adams*), quoting *Wear v. Calderon* (1981) 212 Cal.App.3d 818, 821.) The offer must therefore "carry with it some reasonable prospect of acceptance. [Citation.]" (*Elrod v. Oregon Cummins Diesel, Inc.* (1987) 195 Cal.App.3d 692, 698 (*Elrod*).) A party having no expectation that its offer will be accepted "will not be allowed to benefit from a no-risk offer made for the sole purpose of later recovering large expert witness fees." (*Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1262-1263.)

The reasonableness of a defendant's CCP section 998 settlement offer is evaluated in light of "what the offeree knows or does not know at the time the offer is made." (*Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 119 (*Santantonio*).) As set forth in *Elrod*, *supra*, 195 Cal.App.3d at page 699, the trial court first must determine "whether the offer represents a reasonable prediction of the amount of money, if any, defendant would have to pay plaintiff following a trial, discounted by an appropriate factor for receipt of money by plaintiff before trial, all premised upon information that was known or reasonably should have been known *to the defendant*." (Fn. omitted.) If the offer passes that test, the court then must assess "whether defendant's information was known or reasonably should have been known to plaintiff." (*Ibid.*)

Where the defendant obtains a judgment more favorable than its offer, "the judgment constitutes prima facie evidence showing the offer was reasonable."

19

(*Santantonio, supra,* 25 Cal.App.4th at p. 117.) Here, the jury found that neither Volkswagen nor Ford was liable, establishing the prima facie reasonableness of their CCP section 998 offers. (*Ibid.*) The burden then shifted to plaintiffs to show otherwise. (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 134.) The trial court determined plaintiffs had met that burden. Volkswagen and Ford now must show that the trial court abused its discretion in reaching that decision. (*Najera, supra,* 191 Cal.App.4th at p. 877.)

        a.                *Volkswagen's Offer*

Volkswagen admits their combined settlement offer of $2,002 was modest, but asserts that a defendant may be justified in making a modest settlement offer when it "perceives [itself] to be fault free and has concluded that [it] has a very significant likelihood of prevailing at trial." (*Culbertson v. R.D. Werner Co., Inc.* (1987) 190 Cal.App.3d 704, 710.) Volkswagen claims it reached that conclusion early in the case, in October 2010, before any meaningful discovery had occurred. At that time, the case was still pending in Los Angeles County Superior Court, where plaintiffs' counsel recently had obtained a $1.5 million jury verdict in a similar friction products case involving Ford. Plaintiffs had not yet received responses to written discovery from Volkswagen. Nor had Volkswagen produced its custodian of records or person most knowledgeable for deposition.

In *Najera,* the plaintiff served a CCP section 998 offer along with the complaint. Although the plaintiff prevailed at trial, the trial court denied his request for expert fees because he had served the offer without giving the defendant a reasonable opportunity to conduct discovery. (191 Cal.App.4th at pp. 878-879.) The Court of Appeal affirmed, noting that "'litigants should be given a chance to learn the facts that underlie the dispute and consider how the law applies before they are asked to make a decision that, if made incorrectly, could add significantly to their costs of trial.'" (*Id.* at p. 878, quoting *Wilson v. Wal-Mart Stores, Inc.* (1999) 72 Cal.App.4th 382, 390.)

Here, the trial court similarly concluded that in the absence of any meaningful discovery, plaintiffs "did not know how the case may develop as to

20

Volkswagen."  At that early stage, the waiver of costs would have had little impact on the parties' considerations of the offer, and in the trial court's view, Volkswagen did not reasonably believe that plaintiffs would accept the offer.  Volkswagen has not demonstrated that the court abused its discretion in denying fees under these circumstances.  (See *Najera*, *supra,* 191 Cal.App.4th at p. 877.)

        b.                *Ford's Offer*

Ford's combined offer to compromise under CCP section 998 is different from Volkswagen's because it was made shortly before trial, after most discovery had been completed, and was for $5,000, instead of $2,002.  Relying heavily upon *Adams, supra,* 199 Cal.App.4th 1475, Ford contends the trial court did not give appropriate deference to the presumption of reasonableness flowing from the defense verdict.  We disagree.  Although *Adams* is factually similar, it did not divest the trial court of its discretion to evaluate the reasonableness of Ford's offer under the specific facts and circumstances of this case.  (See *id.* at pp. 1485-1486.)

The decedent in *Adams* died from mesothelioma, a form of lung cancer associated with asbestos exposure.  (*Adams, supra,* 199 Cal.App.4th at pp. 1478-1479.)  His survivors brought a wrongful death action against a number of defendants, including Ford, alleging that the decedent was exposed to asbestos while working in construction and also while changing brakes on vehicles manufactured by Ford and others.  (*Ibid.*)  The plaintiffs reached pretrial settlements with some of the defendants.  (*Id.* at p. 1479.)

A few days before trial, Ford made a CCP section 998 offer to settle the case for a total of $10,000 ($2,500 per plaintiff), including a waiver of costs.  (*Adams, supra,* 199 Cal.App.4th at p. 1479.)  The jury returned a verdict in favor of Ford, finding it did not manufacture or distribute the brakes that allegedly caused the decedent's illness.  The plaintiffs moved to tax Ford's claim for expert fees of $167,570.  (*Ibid.*)  The trial court denied the motion, noting that the evidence against Ford was "'pretty attenuated,'" and that it "'was not surprised at all by the jury's verdict.'"  (*Id.* at p. 1480.)  The trial court determined the offer was not "'out of the ballpark'" given both the settlements with other defendants and the significant value of the costs waiver.  (*Id.* at p. 1481.)  The

21

Court of Appeal affirmed, remarking that "[h]aving presided over the trial, the trial judge was in the best position to evaluate the respective strength of [the plaintiffs'] claim and of Ford's defense, and as such, was also *in the best position to evaluate the reasonableness of Ford's [CCP] section 998 offer*." (*Id.* at p. 1486, italics added.)

Here, the trial court acknowledged *Adams* in its written decision but, based on its own assessment of the evidence, ruled that "the purpose and effect of Ford's section 998 offer was not to promote settlement, but to position Ford to benefit from section 998's cost-shifting provisions." The court took into account the waiver of costs, but observed that the offer was still very low compared with the overall damages of $2.4 to $2.9 million. It further noted that the predominant issue was not, as it was in *Adams,* whether the injured plaintiff was exposed to asbestos-containing Ford products, but whether this exposure was a substantial factor in causing the cancer. The court allowed that plaintiffs' theory of causation on this issue "may have been attenuated," but unlike in *Adams,* the court did not find it unreasonable. As plaintiffs point out, less than a year before the trial in this case, their trial counsel obtained two large jury verdicts in automobile friction cases involving Ford. In one case, the jury found Ford liable on theories of both negligence and strict liability and imposed compensatory damages in excess of $4.3 million.

We will not substitute our judgment for that of the trial court. (*Najera, supra,* 191 Cal.App.4th at p. 877; see *In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682 ["'". . . When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court"'"].) Having presided over a six-week trial involving nearly 30 witnesses and a complex "battle of experts," the trial court was indeed "in the best position to evaluate the reasonableness of Ford's [CCP] section 998 offer." (*Adams, supra*, 199 Cal.App.4th at p. 1486.) In the absence of a showing that the trial court's decision was arbitrary, capricious or patently absurd, we must, and therefore do, defer to its discretionary decision to strike Ford's claim for expert fees. (See *Najera*, *supra*, 191 Cal.App.4th at p. 877.)

22

## DISPOSITION

The judgment on jury verdict and the order taxing the expert witness fees are affirmed. No costs on appeal are awarded.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

Thomas P. Anderle, Judge

Superior Court County of Santa Barbara

_____


The Arkin Law Firm, Sharon J. Arkin; Farrise Firm, Simona A. Farrise for Appellant Christie Steiner.

Yukevich Calfo & Cavanaugh; Yukevich Cavanaugh, James Yukevich, Steven D. Smelser, Patricia Ball; Dykema Gossett, John M. Thomas, Tamara A. Bush, for Appellant Ford Motor Company.

Herzfeld & Rubin, Craig L. Winterman, Tara-Jane Flynn; Carroll, Burdick & McDonough, Laurie J. Hepler, Nathaniel K. Fisher for Appellant Volkswagen Group of America, Inc.

Bowman & Brooke, Susan Vargas, John Eberlein; Reed Smith, Margaret M. Grignon for Respondent Nissan North America, Inc.

Dehay & Elliston, Jennifer Judin, Kevin Wyles; Herrick & Associates, David P. Herrick for Respondent Pneumo-Abex Corp.