Filed 6/12/15  P. v. Ambriz CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JUAN JOSE AMBRIZ,<br><br>        Defendant and Appellant. | C075836<br><br>(Super. Ct. No. 72002614) |

        Defendant Juan Jose Ambriz pleaded guilty to possession of a controlled substance, being under the influence of a controlled substance, and driving under the influence.  (Health & Saf. Code, §§ 11377, subd. (a), 11550, subd. (a); Veh. Code, § 23152, subd. (a).)  Subsequently, defendant filed a motion to vacate the judgment and withdraw his guilty pleas.  Defendant alleged he was not advised of the immigration consequences of his pleas.  Following an evidentiary hearing, the court denied the motion.  Defendant appeals, contending he was misled regarding the immigration consequences of pleading guilty, the court failed to take reasonable precautions to ensure defendant actually understood the required advisement, and the language used in the advisement was too difficult to serve the purpose of the statute.  Defendant also raises

1

several due process arguments:  he was denied due process when the court allowed the prosecution to submit evidence not timely discovered, refused to allow defendant's expert testimony on consulting other experts, and allowed the prosecution to argue with defendant's witness.  Finally, defendant contends the court admitted unduly prejudicial evidence.  We shall affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In April 2004 a complaint alleged defendant possessed methamphetamine, had been under the influence of a controlled substance, and had driven under the influence of alcohol or drugs.  At his arraignment, defendant was given a form that, in Spanish, explained his rights.  Defendant signed the advisement form and told the court he thought he understood his rights.

At the plea hearing on July 15, 2004, the court asked whether defendant had checked all the boxes on the plea form, and defendant responded he had.  Defendant executed the written waiver and plea form after discussing it with counsel.  Defendant also told the court several times that he did not need an interpreter.  Defendant then pleaded guilty to the three counts.

Subsequently, in August 2004 the court granted defendant's application for probation, suspended imposition of sentence, and placed defendant on formal probation for five years, subject to successful completion of a substance abuse treatment program.  The court also ordered defendant to pay various fees and fines.

In April 2013 defense counsel filed a motion to vacate the judgment, alleging defendant was not advised of the immigration consequences of his plea.  Defendant filed a declaration in support of the motion.  The court tentatively denied defendant's Penal Code section 1016.5 motion to vacate.[1]

---

[1]  All further statutory references are to the Penal Code unless otherwise designated.

Defendant's new counsel filed a second motion to vacate under section 1016.5 in August 2013. Following oral argument on the motion, the court granted defendant's motion for an evidentiary hearing.

**Evidentiary Hearing**

*Defendant's Case*

**Dean Settle's Testimony**—Dean Settle worked with defendant at a supply company that specialized in delivering restaurant supplies. Both worked as delivery drivers. Every day the drivers followed a certain route, which could be learned over time. Settle described the company as "chaotic" and was unsure whether the company verified the literacy of its drivers.

Although Settle spoke to defendant regularly, he found it difficult because defendant spoke little English and Settle did not speak Spanish. According to Settle, in order to be understood, "there was a lot of repeating. You would, you know -- it definitely at times would be a chore to get across what I was saying for [defendant] to understand it." Settle also testified defendant is "definitely a lot better now."

**Oscar Corona's Testimony**—Oscar Corona, defendant's brother-in-law, first met defendant in 1999 when defendant came to California. In 2004, when they worked together bussing tables, defendant did not speak much English. Corona also worked at the distribution company. He and defendant spoke only Spanish to one another. According to Corona, "We never speak English because he speak [*sic*] Spanish. I speak Spanish. There was no point for us to speak English at that time." Corona spoke to defendant about wanting to go to school to learn more English.

**Angeles Ambriz's Testimony**—Angeles Ambriz, defendant's wife, testified she met defendant in 2001. Angeles was a "bus girl, and he was a cook." In 2004 defendant could not speak or read English very well. After living together for a few years, the couple married in 2006. They have two daughters.

3

Angeles took the girls to their doctor's appointments because defendant "can't understand the things the doctor has to say to him." According to Angeles, ". . . it's very important for us because if he don't understand, how can give [*sic*] the medicine to the little ones." In addition, in 2004 Angeles had to fill out a job application for defendant because he could not read them. Defendant also had trouble writing addresses on envelopes. He told his wife that when he went to school in Idaho, he could not understand the teachers.

**Defendant's Testimony**—Defendant testified in his own behalf. He was born in 1978 in Mexico and attended school there until he was 12 years old and in the sixth grade. Defendant did not take any English classes in school or speak English in class. He stopped attending school and went to work in the fields.

In 1997 defendant came to the United States. He attended school in Idaho. He tried to go to school, but it was difficult and he quit "because there was like nobody to translate me [*sic*] what the teacher was saying, so I decided to go out and work." According to defendant, "I couldn't read at all. I mean I hardly read in Spanish. For me it was like a big change to read a different language than my own. It was really hard." Defendant did not complete 10th grade in Idaho and did not tell counselors at his treatment center that he had. After two years in Idaho, defendant moved to California.

Defendant identified his signature and initials on a waiver of rights and plea form. He signed the forms because his attorney told him to. His attorney did not tell him he might be deported as a result of the conviction. Defendant did not understand the forms he signed: "I understand some of it, but not all. Not everything." Specifically, defendant did not understand the box that explained possible immigration consequences. Had he understood, he would not have pleaded guilty to the charges. Defendant signed the forms "because I thought that's what you're supposed to do. I didn't read it because I didn't know how to read." When he was asked by the court if he wanted an interpreter,

4

defendant said no because he did not want to embarrass himself "in front of the other guys. I should have said yes."

**Professor Menard-Warwick's Testimony**—Dr. Julia Menard-Warwick is a professor in the Linguistics Department at the University of California, Davis. From 2010 to 2012 Dr. Menard-Warwick served as the director of the English as a second language (ESL) program at Davis. She has authored two books and about 25 articles on the topic of second language learning. In addition, she has made numerous presentations on second language learning.

Prior to teaching at the university, Dr. Menard-Warwick taught ESL for 10 years at a Washington State community college and taught in Nicaragua for one year prior to that. Her dissertation for her doctorate considered literacy development with Latino immigrants and ESL programs in the Bay Area. She based her research on Spanish-speaking women from various Latin American countries.

Dr. Menard-Warwick was qualified as an expert in "second language learning and teaching with specific expertise . . . in the learning of English literacy by Spanish-speaking adults." The professor described literacy "[i]n the sense I would be likely to use in my research it's using reading and writing to conduct your life tasks that you need to get done."

Dr. Menard-Warwick gave her opinion as to whether or not defendant understood the portion of the waiver and plea form advising of possible immigration consequences. The advisement states: "If you are not a citizen of the United States the conviction for the offense charged may have the consequence of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." The professor described her task as, "whether in my best expert judgment somebody with the background that I understood [defendant] to have could have read and comprehended [the advisement] in 2004." To accomplish this, she considered the forms themselves, "the statements of rights in Spanish which was another document entirely, and . . . the

minutes from the court proceeding that took place in 2004 when he said that he had read and understood it."

According to Menard-Warwick, the advisement on the written waiver and plea form "is designed to be read by people who are ready for college." Defendant's basic literacy level was not enough for him to read the advisement, which required advanced academic literacy. The professor explained her analysis in detail. Literacy is reading and writing in everyday life. A person's level of literacy in a second language is influenced by his or her first language literacy level. Learning the concepts of a new language can be very difficult. For example, concerning immigration consequences, a person may understand the concept of removal, but not the basis for the removal.

The professor also testified that a person with a sixth grade Spanish reading ability would not have a sixth grade reading ability in English without school or tutoring. Learning to read a second language is easier if the person already has a high level of oral vocabulary in his or her new language. However, oral learning is often related to one's job. Defendant's job involved loading items for delivery, a task that required only "basic literacy." Reading invoices does not teach a person how to read a legal document like the advisement.

The advisement to which defendant agreed required "academic literacy. It's very abstract, it's very detextualized. It's got very complicated vocabulary. So you need a high level, what's often called a proficient level of academic literacy to be able to read that sentence." Based on her experience with ESL students, Dr. Menard-Warwick would not have expected her students to understand many of the words used in the advisement: conviction, offense, consequence, exclusion, and denial. The key concepts of exclusion from admission and denial of naturalization are complicated and difficult unless explained.

The professor also described her analysis of defendant's education. Rural schools in Mexico where defendant attended school are "very poorly funded. The teachers are

6

not very well qualified, and so the level of educational rigors [*sic*] is not very great . . . . Kids learn how to read, but they don't learn to read very complicated things."

In Dr. Menard-Warwick's opinion, someone with defendant's level of learning experience could neither read nor comprehend the advisement regarding immigration consequences. The professor testified: "To read that sentence, you would definitely need to study English. Pretty much regardless of your level of education."

The professor read the Spanish advisement of rights form and stated she was confused as to why it did not set forth the immigration consequences.

Evidence that defendant carried on a conversation with a police officer would not alter her opinion, because no reading was involved. In addition, the information defendant entered on the narcotics registration form required only basic literacy. Nor did notes from the mental wellness program change her opinion. The note defendant wrote demonstrated only basic English literacy. When questioned as to whether she could know defendant's reading skills in 2004, Dr. Menard-Warwick responded: "I do know. This is my field. I know what it takes for people to learn how to read in a second language."

### *People's Case*

**<u>Officer Calcutt's Testimony</u>**—California Highway Patrol Officer Matthew Calcutt has been with the highway patrol for 13 years. On the night in question, Officer Calcutt responded to a request for assistance from Officer Howard.

Officer Calcutt was asked to assist in examining defendant to determine if he was under the influence of narcotics. He spoke to defendant in English. The officer instructed defendant on how to perform the field sobriety tests. According to Calcutt, defendant "spoke in broken English." Calcutt defined broken English as "grammatically . . . not perfect English." Broken English consist of "Words, phrases that grammatically would not go together at all times. It's not a specific dialect. It perhaps is a word but not in the right tense." If Calcutt had not been able to communicate with

7

defendant he would have called in a translator; he had done so before. It was not necessary during this stop.

After Officer Calcutt found what he believed to be drugs in defendant's car, he asked defendant if the substance was his. The officer testified that defendant stated the "crystal, quote/unquote, was his." Police arrested defendant and took him to be booked. According to Officer Calcutt, defendant answered the booking questions appropriately.

**Ricky Martino's Testimony**—Ricky Martino, a supervising deputy probation officer, was assigned to supervise defendant while he was on probation in 2004 and 2005. Martino testified he discussed with defendant the terms and conditions of probation. According to the probation officer, he did not recall "any significant issues with communication that would require an interpreter." Martino "understood [defendant] when he spoke to me."

**Subsequent Events**

The court denied defendant's request to vacate the judgment. The trial court noted that the transcripts revealed that defendant was thrice asked by the court if he needed an interpreter. Three times defendant answered, "No." The court was never informed at any time prior to the current motion that defendant was unable to understand or read English and needed an interpreter. In addition, defendant responded appropriately to each question asked by the court at all stages of the proceedings.

The trial court concluded: "The Court understands that the gravamen of the Defendant's argument is that the Defendant did not have the education to understand the complex admonition in English. . . . Ms. Menard-Warwick testified that it was almost impossible for him to comprehend the immigration consequences without the assistance of an Interpreter. While the Court has found that all of that may be true, the Court made an Interpreter available to the Defendant at every stage of the proceedings. The Defendant never advised the Court, or apparently his Counsel, that he was unable to understand any part of the proceedings or avail himself of the Interpreter who was

8

present.  [¶]  The Defendant was an adult who responded appropriately to each question asked of him.  He never said anything that would lead the Court to inquire into his ability to read and understand the plea form or the admonitions contained therein, until his Motion [to vacate] . . . .  [¶]  The Court reiterates its sympathy for the Defendant, and the harsh consequences that may follow, but must follow the law as revealed by the testimony in this case."

Defendant filed a timely notice of appeal.  The trial court granted defendant's application for a certificate of probable cause to appeal.

## DISCUSSION

### DEFENDANT WAS AFFIRMATIVELY MISLED REGARDING IMMIGRATION CONESQUENCES OF HIS PLEA

Defendant contends he was affirmatively misled in 2004 when the court provided an advisement of rights form at his arraignment.  The advisement, in Spanish, did not mention any immigration consequences stemming from his plea, and any reasonable person reading the Spanish advisement would be misled to think it contained all the information about his or her rights.  According to defendant, "since the Spanish advisement did not contain the language required by section 1016.5 . . . , appellant was affirmatively misled into believing that a guilty plea would not cause immigration consequences."

**Background**

Section 1016.5 requires that, before accepting a guilty plea to any criminal offense, a trial court must advise a non-United States citizen defendant that conviction of the offense may result in deportation, exclusion from admission to the United States, or denial of naturalization.  The statute allows the defendant to move to vacate the judgment if the trial court fails to give the required advisements.  A motion to vacate judgment under section 1016.5 may be brought in the trial court after imposition of judgment.

9

(*People v. Totari* (2002) 28 Cal.4th 876, 879 (*Totari*); *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 203-204 (*Zamudio*).)

The purpose of section 1016.5 is to ensure that a defendant possesses both actual knowledge of the possible adverse immigration consequences of a guilty plea and the chance to make an intelligent choice whether to plead guilty. A noncitizen defendant has a substantial right to be given complete advisements under section 1016.5. (*Zamudio*, *supra*, 23 Cal.4th at pp. 193-194; *People v. Gutierrez* (2003) 106 Cal.App.4th 169, 173 (*Gutierrez*); *Totari*, s*upra*, 28 Cal.4th at p. 883.)

In order to prevail on a motion to vacate predicated on section 1016.5, a defendant must establish that he or she was not properly advised of the immigration consequences as provided by the statute; there exists, at the time of the motion, more than a remote possibility that the conviction will have specified adverse immigration consequences; and the defendant will be prejudiced by the nonadvisement. (*Totari*, *supra*, 28 Cal.4th at p. 883.) We uphold an order denying a section 1016.5 motion unless we find a clear abuse of discretion. A trial court's exercise of its discretion in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice constitutes an abuse of discretion. (*People v. Limon* (2009) 179 Cal.App.4th 1514, 1517-1518.)

**Discussion**

Defendant argues: "Any reasonable person reading the Spanish advisement would be affirmatively misled to think that it contained all he or she was required to know about his or her rights." Since the Spanish advisement did not set forth the immigration consequences, the court erred in denying defendant's section 1016.5 claim.

The allegedly deficient Spanish advisement was given to defendant at his arraignment. Defendant signed the form and told the court he understood his rights. Subsequently, during the plea hearing, defendant read the waiver of rights, in English; checked all the boxes; and again told the court he understood his rights. Defendant

discussed the contents of the form with his counsel. Several times defendant assured the court he had no need for an interpreter.

As the court in *People v. Akhile* (2008) 167 Cal.App.4th 558, 564 found, "the advisement [required by section 1016.5] must occur within the context of the taking of the plea." An advisement at the arraignment does not satisfy the statute. (*Ibid*.) The Spanish language advisement defendant read and signed at the arraignment would not have satisfied section 1016.5 regardless of its contents. Therefore, any alleged deficiency in the arraignment advisement had no impact on his subsequent waiver during the plea hearing.[2]

## COURT'S FAILURE TO TAKE REASONABLE PRECAUTIONS TO ENSURE DEFENDANT'S UNDERSTANDING

Defendant argues that when a trial court gives a defendant an advisement written in his or her own language, the court has an elevated duty to ensure the advisement is actually understood. According to defendant, he put on overwhelming evidence showing he could not have understood the English advisement regarding immigration consequences and the Spanish advisement failed to explain the consequences.

In support, defendant argues he presented overwhelming evidence that he could not have understood the immigration consequences as set forth in the English advisement because of his extremely limited English comprehension. He notes that he had a "mere

---

[2] Defendant cites *United States v. Botello-Rosales* (9th Cir. 2013) 728 F.3d 865, in which a defendant was misled about his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] through a faulty warning in Spanish. The court noted the defendant had been previously advised correctly in English but found the misleading Spanish advisement required the government to show clarity and correct the error. (*Botello-Rosales*, at pp. 867-868.) The court noted the stressful scenario created by custodial interrogation as part of the basis for its finding. (*Ibid*.) However, here we are considering an advisement at arraignment that did not meet the requirements of section 1016.5, and we are not persuaded by defendant's attempt to compare court proceedings and custodial interrogation in terms of stressful environments.

11

sixteen minute period" the day he entered his guilty plea during which his counsel could explain the complicated written waiver and plea form. As a consequence, defendant contends, "the [trial] court did not do enough. It was the trial court after all which provided the misleading advisement in Spanish." In support, defendant cites *People v. Soriano* (1987) 194 Cal.App.3d 1470 (*Soriano*) for the proposition that, when the court provides a defendant with an advisement written in his own language, the court has an elevated duty to ensure the advisement is understood.

In *Soriano*, the defendant alleged counsel performed ineffectively by failing to advise him adequately of the deportation consequences of his guilty plea. In his writ petition, defendant stated that at the time he entered his guilty plea he did not know that the plea would subject him to deportation, and if he had understood the consequences of his plea he would not have entered it. (*Soriano*, *supra*, 194 Cal.App.3d at pp. 1472-1474.)

The court found: "Petitioner failed to make a sufficient showing at the hearing on the petition to overcome his own statement, made at the time his plea was entered, that he understood the [section] 1016.5 advisement. Defendant sought to prove his English comprehension was so poor that without an interpreter's assistance he was incapable of entering a guilty plea with 'sufficient awareness of the relevant circumstances and likely consequences.' [Citation.] However, having failed to establish that his English was so faulty that he could not understand the section 1016.5 advisement, defendant failed to meet the first requirement for the writ. He did not show that his language difficulty was a fact unknown to the court and a fact which would have prevented rendition of judgment." (*Soriano*, *supra*, 194 Cal.App.3d at p. 1477.) The critical issue under section 1016.5 is whether a defendant has been advised that his guilty plea may have immigration consequences. (*Soriano*, at p. 1475.)

Section 1016.5 does not require any specific manner in which the court must advise the defendant of the immigration consequences of his plea. Nor is the court

required to advise the defendant of these consequences verbally. A validly executed plea agreement containing the immigration advisement is sufficient. (*People v. Ramirez* (1999) 71 Cal.App.4th 519, 521; *Gutierrez*, *supra*, 106 Cal.App.4th at p. 175.) Here, at the time of the plea, defendant told the court he had read the waiver of rights and plea agreement and understood his rights. He checked all of the boxes on the form indicating he understood his rights. According to the waiver form, both defendant and defense counsel went over the form together. In addition, defendant stated he did not need an interpreter. Given the evidence before us, we cannot find the court abused its discretion in denying defendant's motion to vacate based on any failure on the part of the trial court to ascertain his understanding of the waiver.

## DIFFICULTY OF ADVISEMENT LANGUAGE

Citing the language of the advisement, defendant contends the advisement regarding immigration consequences was too complex for someone with his limited English to understand. Therefore, the trial court erred in denying his motion to vacate the judgment.

**Discussion**

According to defendant, "The crucial liberty interest involved in immigration consequences requires an advisement that is understandable by the average person." The advisement in this case, defendant argues, does not meet this standard. However, the written advisement defendant signed virtually mirrors section 1016.5, subdivision (a).

At the evidentiary hearing, Dr. Menard-Warwick testified that the advisement is "very abstract, it's very detextualized. It's got very complicated vocabulary. So you need a high level, what's often called proficient level of academic literacy to be able to read that sentence." However, "A defendant who has signed a waiver form upon competent advice of his attorney has little need to hear a ritual recitation of his rights by a trial judge. . . . [¶] . . . So long as the waiver form contains sufficient information, and both the defendant and his counsel attest to its valid execution, the judge may, in his

13

discretion, dispense with further explanation to the defendant of his rights." (*In re Ibarra* (1983) 34 Cal.3d 277, 286.) As we have noted, the written waiver advised defendant of the possible immigration consequences of his plea. On the form, defendant indicated he understood his plea could result in deportation, exclusion from the United States, and denial of naturalization. Defendant's attorney stated he had discussed the contents of the plea form with his client. Defendant assured the court he understood his rights and declined any aid from an interpreter. Given these facts, the court did not abuse its discretion in denying the motion to vacate based on the difficulty of the waiver's language.

**DUE PROCESS CLAIMS**

**Submission of Evidence Not Previously Discovered**

At the beginning of the evidentiary hearing on defendant's ability to understand English, the prosecution informed the defense that it had evidence pertaining to the case. The court allowed the evidence, which defendant claims violated his right to due process.

Defendant objected to any use of any of the evidence that the prosecution failed to provide to the defense prior to the evidentiary hearing, citing lack of discovery and notice. In support, defendant cited Evidence Code section 1054, which mandates reciprocal discovery in criminal cases. The court overruled the objection, finding section 1054 only applies to criminal trials.

On appeal, defendant contends he was denied due process as a result of the trial court's ruling permitting the prosecution to present evidence at the evidentiary hearing that had not been made available prior to the hearing. According to defendant, as a result of the lack of prior discovery, the defense could not adequately prepare to question the expert, prejudicing defendant.

Our review of the evidence does not reveal any such prejudice. The only example defendant provides is that the prosecution presented documentary evidence, including a lengthy report, that Dr. Menard-Warwick "was forced to analyze . . . off the cuff."

14

However, during cross-examination, Dr. Menard-Warwick was questioned extensively about a variety of documents, including records from the drug treatment program. Dr. Menard-Warwick considered the information and repeatedly reiterated her belief that defendant could not have read and comprehended the section 1016.5 advisement regardless of whether he stated he could. Defendant points to no other ramifications of the belatedly discovered evidence, and we find no prejudice.

**Expert Testimony**

The trial court refused to allow Dr. Menard-Warwick to testify that she had relied on another expert's opinion in formulating her opinion regarding defendant's ability to read English. This refusal, defendant contends, denied him due process.

*Background*

During the direct examination of Dr. Menard-Warwick, defense counsel asked her for an opinion based on a hypothetical: "Do you think it would be possible for someone with a sixth grade education in Spanish from a rural Mexican school to be able to read and understand the [advisement on immigration consequences] without having studied for many years English after arriving in the United States?" The professor replied: "No. To read that sentence, you would definitely need to study English. Pretty much regardless of your level of education. To be able to read a sentence like that, you need to do some study in English." Defense counsel asked the witness if she had confirmed her "opinion with any experts in relying on them to come to a conclusion?"

The prosecution objected to the question. In sustaining the objection the court found: "[W]hat you're asking her to do is to say this other person who hasn't been qualified as an expert, I gave these facts to him, and they came to the same conclusion as me. Which is different than relying on a study that was done or something like that."

*Discussion*

Evidence Code section 801 states: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to

15

a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and  [¶]  (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."  Evidence Code section 804, subdivision (a) states that an expert may testify to the statements of other experts if those statements were used to form the expert's own opinion.

Defendant argues the court's refusal to allow Dr. Menard-Warwick to testify that she relied on the opinions of other experts in forming her opinion violated his right to due process.  We disagree.

Defense counsel asked Dr. Menard-Warwick if she had confirmed her "opinion with any experts in relying on them to come to a conclusion" regarding her opinion as to how much English proficiency was necessary to understand the immigration advisement. In sustaining the prosecution's objection, the court correctly noted the question did not establish who the experts were or what their expertise consisted of.  Instead, defense counsel sought to elicit testimony about whether an unnamed expert agreed with Dr. Menard-Warwick's conclusion.  We review the trial court's evidentiary rulings for an abuse of discretion.  (*People v. Dean* (2009) 174 Cal.App.4th 186, 193.)  We find no such abuse of discretion.

**Prosecution Argument With Expert**

Defendant asserts the trial court allowed the prosecution to argue with Dr. Menard-Warwick.  Defense counsel was denied "a reasonable chance to respond to the improper questioning, denying him due process."

16

*Background*

During cross-examination of Dr. Menard-Warwick, the prosecution asked the professor about the written waiver and plea form: "So it indicates that he did talk to his attorney about his rights, consequences, isn't that correct, if this form is to be believed?" The witness replied: "That's what that says, but I also stand by my firm considered expert opinion that he could not read that sentence. Maybe he's indicating that he read that sentence, but my firm opinion is that he could not have read that sentence no matter whether or not he said he could."

This exchange followed:

"Q. That's again based upon what you believe to be a sixth grade education from rural Mexico . . . .

"[Defense Counsel]: Objection. Argumentative.

"[Prosecutor]: He did nine years . . . .

"The Court: He can actually argue with her.

"The Witness: Can I argue back? When can I argue back?

"The Court: Well, actually he can't really argue.

"[Prosecutor]: Nothing further.

"The Court: But vigorous cross-examination.

"[Prosecutor]: Thank you, ma'am.

"The Witness: Can I take that as a question and respond?

"[Prosecutor]: No, I withdraw whatever that was."

*Discussion*

Defendant argues that, because his request for a brief recess had previously been denied, his "case ended with the prosecution arguing and harassing a defense witness, and without a realistic opportunity for [him] to respond." We disagree.

After defense counsel objected to the questioning of Dr. Menard-Warwick, the trial court ruled that the prosecution could not argue with the witness. The prosecution

17

then withdrew the question and ended the cross-examination. Although Dr. Menard-Warwick wanted to answer the question and expressed frustration at being denied the opportunity to respond, there was not really an argument or harassment on the part of the prosecution. Defendant was not denied due process, nor was he prejudiced by the brief exchange.

**Unduly Prejudicial Evidence**

Finally, defendant asserts the trial court should have granted his motion to vacate because the prosecution was permitted to introduce unduly prejudicial evidence. Defendant points to testimony relating to his level of sobriety and possession of a controlled substance.

### *Background*

During the direct examination of Officer Calcutt, the prosecution asked him if he had received any training in drug recognition. Defense counsel objected, arguing the court called the evidentiary hearing for the sole purpose of deciding whether or not defendant had the English ability to understand the advisement. The trial court allowed the officer to answer, with the understanding the prosecution would "lay some foundation with respect to his subsequent testimony . . . that he's going to give with respect to whether or not [defendant] could understand English." Officer Calcutt testified he received specialized training in the detection of persons under the influence of controlled substances.

Calcutt also testified he spoke to defendant in English and instructed him on how to perform the field sobriety tests. According to Calcutt, defendant spoke "in broken English," "not perfect English." The officer described defendant's speech as "Words, phrases that grammatically would not go together at all times. It's not a specific dialect. It perhaps is a word but not in the right tense." Officer Calcutt also testified he found what he believed to be drugs in defendant's car. He asked defendant if the substance was

18

his.  The officer testified that defendant replied "the crystal, quote/unquote, was his."
During the booking process, defendant answered questions appropriately.

### *Discussion*

According to defendant, Officer Calcutt's testimony was inadmissible and unduly
prejudicial because it highlighted specific facts about defendant's use and possession of
drugs:  "Evidence of drug use will make any trier of fact look at a defendant in a
prejudicial light, and make them less likely to find in the defendant's favor."  In addition,
defendant contends his reading ability was the main issue, not primarily his oral
comprehension.

Under Evidence Code section 352 the court may exclude evidence if its probative
value is substantially outweighed by the probability its admission will necessitate undue
consumption of time or create substantial danger of undue prejudice, of confusing the
issues, or of misleading the jury.  We review the trial court's decision to admit evidence
under the abuse of discretion standard.  (*People v. Pierce* (2002) 104 Cal.App.4th 893,
900-901.)

Officer Calcutt's testimony regarding his interactions with defendant during the
2004 traffic stop were relevant to the central issue of the evidentiary hearing:  defendant's
comprehension of English in 2004 when he entered his guilty plea.  As part of that
testimony, Calcutt discussed defendant's ability to comply with the field sobriety test and
his ability to communicate with the officer.  Defendant spoke "broken English," but when
asked about the substance in his car, he replied "Crystal."  Defendant also responded to
the booking questions appropriately.  The prejudicial aspect of the testimony—
defendant's involvement with drugs—did not outweigh its probative impact.

Although defendant argues his reading ability was at issue, not his oral
comprehension, both are part and parcel of the same inquiry.  When entering his guilty
plea, defendant stated he understood what he had signed and did not need an interpreter.
The trial court, in reviewing the plea, necessarily considered defendant's ability to both

19

read and speak English and understand his lawyer, abilities Officer Calcutt's testimony directly related to. We find no abuse of discretion in the trial court's admission of Officer Calcutt's testimony regarding drug possession.

## DISPOSITION

The judgment is affirmed.

                                                RAYE           , P. J.

We concur:

        MURRAY      , J.

        HOCH        , J.

20